## THE TRANSFER NO. 8.

(District Court, S. D. New York. April 14, 1898.)

COLLISION—DAMAGES FROM SUBSEQUENT NEGLIGENCE, NOT PROXIMATE.

The barge M. being damaged so as to be in a sinking condition by the mutual fault of No. 8 and the W., and being thereafter taken by the W. two miles with other boats in deep water, where she sank, a total loss of boat and cargo and damaging the W.'s propeller as she went down, *held* that the W. had such notice of the M.'s condition as to require the W. to beach her, as might have been done; and that for failure to do so the W. should alone bear $1,000 of the total loss, as chargeable to the W.'s subsequent negligence, and not the proximate result of the collision.

These were libels in rem brought, respectively, by the Philadelphia & Reading Railway Company and the Thames Towboat Company against the steam tug Transfer No. 8.

James Armstrong, for libelant.
Henry W. Taft, for Transfer No. 8.
Carpenter & Park, for the Waterman.

BROWN, District Judge.   Under the usual order of reference upon an interlocutory decree for damages in a case of collision, it is open to the defendant to show that any part of the damages claimed resulted through negligence or inattention subsequent to the collision; since damages caused by such subsequent negligence are not the proximate results of the collision itself.   In behalf of Transfer No. 8 in the present case, it is contended that the total loss of the barge Maine and her cargo by sinking in deep water at Port Morris, two miles from the place of collision, is not the proximate result of the collision alone, but was due to the failure of the Waterman, which had the Maine in tow, to beach her properly in shallow water, where at least the cargo might have been mostly saved, even if the barge were a total loss.   The entire damage reported by the commissioner for the loss of cargo was $2,392, and the value of the barge and her furniture and outfit $2,679.80.   In the libel, however, of the owner of the Waterman against Transfer No. 8 for injuries to the Waterman through the sinking of the Maine at Port Morris, an interlocutory decree has been entered adjudging each vessel to pay one-half the damage.   This decree was entered without any controversy on the point now raised; but so long as it stands it is none the less an adjudication, and necessarily involves the finding that the damage by the sinking at Port Morris, as well as the injury to the Watermar at the same time, were the proximate results of the previous collision; and both causes being before the court at the same time, the adjudication in the Waterman case, so long as it stands unopened, is a technical bar to the reopening of the question whether those damages are to be excluded, as arising through subsequent negligence, or not.

Notwithstanding this situation, a large amount of testimony was taken on this very question in the hearing before the commissioner; and upon the argument of the exceptions before me I have understood

that the parties have given all the evidence that either desired to give on that subject, and that the court was desired to determine the above question, aside from the technical bar above referred to, upon the understanding that the decree in the Waterman case should be reopened if the court should be of the opinion that on the merits any part of the loss of the Maine and her cargo should be deemed justly attributable to the subsequent fault of the Waterman.

The testimony on this subject is very conflicting and contradictory. The conclusion to which I have come is, that though the master of the Waterman made no examination of the Maine to ascertain immediately after the collision whether the Maine was in a fit condition to be able probably to make the trip to Port Morris in deep water, yet that he very soon afterwards, at least by the time the vessels were at Hogsback, where some of the vessels grounded, knew that the Maine was in a sinking condition and could not possibly hold out much longer. He saw those on board abandoning her; and this, with the fact that she was gradually sinking, was sufficient notice to him that she must speedily go down and could not probably reach Port Morris creek. It was his duty, therefore, either to endeavor to beach her at once, or else to cast her off and suffer her to drift ashore, where at least a part of her cargo might have been saved. No attempt was made to do either. I am satisfied upon the evidence that this might and should have been done; and that the presence of the other boats in tow did not prevent one or the other of those measures.

As the amount of additional damage through the total loss of the cargo arising from sinking in deep water at Port Morris, must necessarily be chiefly a matter of estimate, I do not think it advisable to send the matter back for further evidence, unless that course be desired. The barge if allowed to drift ashore would doubtless have become a total loss; the saving of the cargo of coal would have been attended with considerable expense, the coal saved would have been subject to some depreciation in value, and the loss of the Waterman's propeller would have been avoided. The net saving in loss could not well have been less than $1,000. So much of this loss should, therefore, be charged, I think, to the Waterman alone; and the residue of the amount of the damages reported should be divided equally between the two vessels, as the proximate result of the collision.

If either party is dissatisfied with the above estimate, an order may be taken referring the matter again to the same commissioner, the party entering the order, to bear the expense of the reference, unless a more favorable report is obtained.