THE ROBERT H. COOK (two cases).

(District Court, N. D. New York. August 18, 1913.)

1. TOWAGE (§ 12*)—DUTY OF TOWS TO FOLLOW TUG.

It is the duty of those in charge of boats making up a tow to do what they reasonably can, in the exercise of ordinary care, to see that they follow the tug.

[Ed. Note.—For other cases, see Towage, Dec. Dig. § 12.*]

2. TOWAGE (§ 12*)—INJURY TO TOW—LIABILITY.

When a tug with 29 coal-laden boats in tow in 14 tiers of two each and one in the rear was passing around Pulpit Point in Lake Champlain where the channel is winding, going north, a canal boat on the port side of the tow sagged against the government boom placed to keep boats off the rocks and was injured, increasing her leak. There was considerable wind from the south and a strong current. The master of the boat was not using her tiller. He knew of the injury but after pumping her out several times went to sleep at night when the tow was more in the open lake and the water was rough, leaving no one on watch. He was awakened by the coming in of the water and he and the master of the boat alongside started to pump, but she soon sank. He did not notify nor signal the tug of her condition. Held, that the master of the tug was negligent in attempting to pass the point with such a tow under the weather conditions prevailing and in not directing those in charge of the tows to use their tillers; that the master of the canal boat was also in fault for not keeping watch and giving notice of her injury, in which case the tug

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

might have saved her or lessened the damage; and that the damages should be divided.

[Ed. Note.—For other cases, see Towage, Dec. Dig. § 12.*]

In Admiralty. Libels by the Western Assurance Company and by the British & Foreign Marine Insurance Company, Limited, against the steam tug Robert H. Cook. Decrees for libelants for half damages.

Carpenter & Park, of New York City, for libelants.
O. A. Dennis, of Whitehall, N. Y., for claimant.

RAY, District Judge. As both the above cases arise out of the same accident, they will be considered together.

April 27, 1909, at about 9 a. m., the canal boat "Fred Grube," laden with a cargo of coals with some 28 other loaded boats, was taken in tow by the steam tug Robert H. Cook, owned by Lake Champlain Transportation Company, at Whitehall, N. Y., bound north for the port of Quebec, Canada. The tow was made up in 14 tiers, two boats abreast, with a single boat in the rear of the line. The "Fred Grube" was the outside port boat of the tenth tier. When the tow started out the wind was blowing some from the south and increased during the forenoon, although this is denied by the claimant. The water was running high with quite a current. There was some dragging at times on points of land, as the channel was narrow and crooked when passing what was known as the "Marshes," and at or opposite Pulpit Point, on the west side of the channel and lake, some nine miles from Whitehall, the Fred Grube sagged outwardly and over towards the shore and struck a boom placed there to prevent the collision of passing boats with the rocky shore. The Fred Grube sustained some damage in this collision. The pumps were sounded but no leak of consequence then appeared. The tow was not halted, it is claimed, and that something like a half mile further on some of the foremost boats took the ground at a point separating what are known as the East and West channels. This caused a stop and the tug went back to pull the grounded boats off. It is claimed that at this time the master of the Fred Grube notified the captain of the steam tug Robert H. Cook of the said damage to the canal boat, but that no attention was paid, and that nothing was done to ascertain the extent or nature of the damage or secure the safety of the damaged boat. The tow was in shape to proceed about midnight, and some time thereafter, it is claimed, the Fred Grube, because of such damage, commenced to leak badly and soon filled and sank. That she leaked and sank is not denied but that the steam tug was in any way at fault is most strenuously denied. The libellant alleges fault and negligence in seven particulars, viz.: Not having a proper lookout; not having a shorter tow by putting more boats abreast in a tier, thereby shortening the tow and bringing it more under the control of the tug; not having a competent master and pilot; the steam tug being of insufficient power to handle such a tow; not having sufficient help on the tug and tow to keep such tow in the wake of the steam tug and consequently in the channel; in negligently permitting the Fred Grube to sag to the shore and collide

with the boom; in not coming to the assistance of the Fred Grube knowing her to be in danger or injured and taking proper and timely measures to insure her safety.

Red Rock Bay is south of Pulpit Point, and in going north the course is first northwest towards the point and then bends quite sharply towards the east and then to the north. It is here that the United States government for many years has maintained the boom mentioned to protect boats from going on the rocks. It is recognized as a more or less dangerous place. This boom was known, properly constructed, and located in a circular form around the point. The tendency of a boat going against it was to sag away therefrom if being drawn ahead. The tug was manned by a captain, a pilot, two engineers, two firemen, a deck hand, and a cook; was of 600 horse power and fitted with a steam pump having a capacity of 1,600 gallons per minute. Both the captain and the pilots were duly licensed. The western shore of the lake is mountainous with openings in the hills, and the claimant asserts that on arriving at this point there was a sudden rising of the wind or exposure to it which was unsuspected but that the tow was slowed down to some 1½ or 2 miles per hour. The master of the boat Grube does not complain of the speed; says it was going slow enough. Nine tiers of these boats passed the point without colliding with the boom, but the Grube sagged outwardly and struck and slid along the boom as did the boat in her rear. The next boat in the tow was a scow with irons at the sides and this caught in the chain holding the boom and dragged it loose. The next boat in line, the Riley, ran on the rocks. The captain of the Riley signaled the tug, which drew in its hawser and came back to give any necessary aid. The master of the Grube was then on the Riley assisting in pumping. The claimant contends that it was while this was being done that the tow drifted ahead and that some of the boats grounded. The master of the Grube says that she struck the boom, port side forward of its cabin, with such force that:

"I stood on the deck and it raised me up about six inches in the air on the deck."

He explained this later as an upward bulge of the deck where he stood. He was not thrown down. As to the effect it had on the side of the Grube, he said it "opened her up about three inches." He had about 2½ feet freeboard and:

"Q. Was this damage to the boat above the water line? A. It was right below the water. Q. At the point where the boat struck the boom? A. Yes, sir. * * * Q. Did you sound your pumps after striking the boom? A. Yes, sir. Q. Find any leaking? A. Just a trifle."

Later he said this injury was some two feet above the water line. He then testifies that this collision occurred about noon, and that the tow went aground at about half past 12 or 1 o'clock and was straightened out about 5 o'clock, and that while aground the tug came back as far as his boat, and that:

"I told Capt. Rockwell (in charge of the tug) he damaged the boat and he better come over and look at her, and he never answered me, went on with his boat."

Says he tried his pumps after that during the rest of the day and the last time, about half past 10 in the evening, found about four inches of water and pumped her out. He conveyed no information as to this to the master of the tug. Capt. Prior was in charge of the boat along-side of the Grube, and Gordon says he and Prior talked they would lie down and the first one to wake should call the other *if anything happened*.

"Q. What was the next thing that happened? A. When I waked up, there was about three inches of water on the floor; I called Capt. Prior and he came over and I got Victor Jandreau up on the boat behind and we casted his lines on the J. G. Lafagette [the boat alongside the Grube]."

He then says the boat sank before the remainder of the tow, four tiers, had passed. On cross-examination he says they went slow enough through the marshes and at Pulpit Point were going 3 or 4 miles an hour; that his boat sagged up against the boom sidewise which he had stated projected 3 or 4 inches above the water; that the seam opened up *was not* below the water line and that the boom did not strike the sheer plank; that the seam he testified to on his direct examination as caused by the collision was a foot or two above the boom, and later he said two feet; and that so far as he could see there was no seam or injury below the water line. He was asked if he told the captain of the tug that he was leaking, and his answer was:

"I don't remember. I don't believe he ever said a word. I know he didn't."

He also testified that the boat leaked when loaded and that after that he tried his pumps. Then:

"After you sagged against the boom did you try her? A. Yes, sir. Q. Any water? A. A little. Q. How much? A. About 1½ inches or 2 inches. Q. Where after that did you try her? A. Now and then all the way down. Q. Well, when? A. I should say probably every half hour. Q. Did you discover any water in her? A. Just leaking right along. Q. Any more than what the general leak had been prior to that time? A. Well, she leaked a little more after she struck the boom. Q. How much? A. Half an inch an hour."

He made no signals to the tug, although he says he knew what the signals were and how to give them. He was alone on the boat and no one was left on watch when he went to bed.

This was an old boat, built in 1891, but since some new timbers had been put in without changing the old ones. When the boat sank the tow was more out in the lake; that is, where the lake was wider. Gordon also says the wind had increased, was increasing all the time; there was a strong wind and the sea was rolling pretty heavy at the time the boat sank, and that the boats rolled. He also says that he went to bed at half past 10, laid awake an hour and a half, and at half past 10 felt the sea shaking him up but went to sleep and was awakened by the water coming in at half past 12 or 1 o'clock.

"Q. What around you? A. The water. Q. Touch you? A. No, I *heard* it coming in. Q. Waked you up? A. Yes, sir. Q. How much water was there? A. About three inches."

This tow was about 1,800 feet from tug to rear boat and it was about 1,100 feet from the tug to the Grube. Capt. Prior makes no

claim to a heavy wind or to much of any wind when the tow started out, but says they felt it more as they got further out and in the vicinity of the point where it has a sweep around the point. Gordon told Prior at the time:

"If he had any damage it was in the forward of his cabin; he didn't know whether he had any damage or not."

Prior also says that Gordon did no more pumping after the collision with the boom than usual and that he had been pumping all the way down. Prior also says the tug was just drifting as they passed Pulpit Point and that the wind was on the starboard side and that the current set in towards the point. Rockwell, the captain of the tug, says he was going slow at the point; that the channel was narrow and crooked; that a helper would have been of no assistance; that it could not have maneuvered alongside the tow; and that at the rear it would not have been of any assistance. He also says:

"Q. Was it the effect of the wind and current that sagged the boat up against the boom? A. Yes, sir."

That he then slowed down and as soon as he reasonably could went back on the signal of the Riley, inquired if damage had been done, and in substance informed all of them that if damage was discovered to inform him. Riley corroborates this. He sat up all night watching for leaks, although he had stopped the leak in his boat soon after the accident. Substantial evidence was also given that some considerable time elapsed after the captain of the Grube discovered the water coming in and the sinking of his boat, and that the tug could have gone to its assistance and pumped her out or grounded her before sinking if he had been notified by signal. There is also evidence that if the men on the boats had been at their tillers they could have kept the boats away from the boom. There was also evidence that if the tow had been made with the boats three abreast it would not follow as well, especially around bends, and could not meet at all places in the marshes. It was also testified that Gordon after the accident told Mr. Holden of the transportation company that he had no fault to find with the tug and that Capt. Rockwell did all that any one could. There is also evidence that the side of the Grube as she lay at the loading place, or in that vicinity, was bulged in and that the deck bulged upwardly.

I am very well satisfied from this evidence, a brief outline of which has been given, that there was negligence on the part of the captain of the boat Fred Grube as well as on the part of the captain of the tug Robert H. Cook. It is quite impossible from this evidence to determine whose negligence caused the Grube to go on the boom, but it is quite certain that due care and watchfulness on the part of her captain after the collision would have averted the sinking or would have enabled the tug to come to her rescue and to have beached her at least.

If, when boats are taken in tow as these were, the persons in immediate charge of them owe no duty to the tug or its owner, then it was in law the sole negligence of the tug that caused such damage to the Grube as she actually received when she struck the boom. If she

was injured in that collision, as Gordon claims she was, and was leaking thereafter constantly, and the wind was increasing and the waves running high and rolling and tumbling the boat, it is unaccountable that he should have gone to bed and to sleep on this very dark and misty night. It was gross negligence to do so. It is also very strange that Gordon did not give a signal when he awoke and found the water coming in, was awakened in fact by the inpour of the water. It appears that the owner of the Grube, Gordon, her master, had offered to sell her for less than the insurance. The captain of the tug knew that this lake at the point was a dangerous place to navigate and that he had a very long and heavy tow as most of the boats had a double load; and while, of course, her captain could not know how much the wind would blow on Lake Champlain during the voyage, or until he reached a wide channel and deep water where there would be no danger of running ashore or on the rocks in rounding points, he did know that April is a very uncertain month as respects the currents of air and their velocity; and I think it was negligence to attempt to take that' long tow of double-loaded boats through that crooked channel and around that dangerous point without taking extra care and precaution. The tow could have been divided until that point was passed in charge of two tugs, or if two tugs were not obtainable then a part of the tow should have been left behind. Capt. Rockwell could have instructed the masters on the boats to use their tillers to keep the boats off. I do not think he was proceeding too rapidly; if there was any fault in respect to speed at this point, he was going too slow, as boats will follow better if the towline is kept taut at such a point. If the tow is left to drift, wind and current will take it ashore unless moving out to sea. I am convinced that the Grube was in poor condition, an unsuitable condition for such a voyage loaded as she was, and that a very slight shock was sufficient to so open or weaken her seams as to make further progress dangerous to her. She was old; this was her first voyage that spring; she was more or less damaged, etc. But all this was unknown to the captain of the tug except as he looked her over generally. All this was known to her master. After the collision and increased leaking it was his duty at once to notify the captain of the tug of her *actual* condition, which, on his own evidence, he did not do, and to keep a constant all night watch, as they were going out into deeper and broader water in a very dark night and with increasing wind which rocked or tumbled the boat and made a heavy sea. There is grave suspicion that the master of the Grube did not care whether she sunk or swam, survived or perished, so long as he himself survived. At best he was lazily indifferent. He had reason to apprehend trouble in those troubled waters after the collision, taking his own statement as true. It is evident that under ordinary conditions the Grube would not have struck the boom, and it is equally evident that this boom was placed there with the expectation that under some conditions boats would swerve or sag from the channel and strike it. The boom was there to be struck on occasion and keep the striking boat off the rocks. But all this does not excuse the want of suitable care and precautions on the part of the tug having the boats in tow, including the proper make-up of the tow, to meet conditions

known or reasonably to be apprehended. It would have been a wise thing for some one to have provided fenders for these boats when rounding such a point where a dangerous situation was recognized and had been for some ten years.

[1] It was the duty of the tow to follow the tug and of those in charge of the boats making up the tow to do what they reasonably could, in the exercise of ordinary care, to see that this was done. The Stranger, 1 Brown, Adm. 281, Fed. Cas. No. 13,525; 1 Asp. M. L. C. 19; The Ciampa Emilia (D. C.) 46 Fed. 866; The Jacob Brandow (D. C.) 39 Fed. 831, 832; The Thomas Wilson (D. C.) 124 Fed. 649; The Henry O. Barrett (D. C.) 156 Fed. 417; The W. G. Mason (D. C.) 131 Fed. 632. This is not a case where a presumption arises from the mere collision of the Grube with the boom that the tug was negligent, for here was a point to be rounded and a danger signal in the form of this boom which told all navigators passing that there was liability to get out of the channel and that the boom was there to prevent going on the rocks in case they did or in case they were forced towards the point by wind or current or both.

I am satisfied from the whole evidence and find:

[2] I. That the captain of the Robert H. Cook was guilty of negligence in attempting to take this long tow out into the main part of the lake and around Pulpit Point under the prevailing weather conditions and other known conditions, currents, etc., perils to navigation, without a helper and without notifying those in charge of the loaded boats to be on the watch and use their tillers to keep off the boom and dangerous points. He had reason to apprehend that some part of such tow, made up as this was and extended to such a length, was liable to be thrown by wind and current against the boom, with what force he could not foresee, but with sufficient force to cause damage to the weaker boats especially. While a short tow on a short towline will follow the tug and in its wake in a reasonably straight channel, the rear portion of such a long tow as this in a crooked channel bending as this did at and in the immediate neighborhead of Pulpit Point will not, especially if there be winds and currents, as there was here, tending to deflect the tow and carry it on the obstruction or rocks. The captain of the tug of course knew that any sudden and at all violent contact of any boat in the tow with the boom would be liable to do damage and that such damage might result in sinking the boat. It was therefore his duty to exercise greater care and caution than he did in rounding or passing this point, with this tow, by either using a helper or by notifying the masters of the boats to use their tillers or fenders and seeing that it was done.

II. This negligence on the part of the captain of the tug resulted in the collision or a collision so violent that, in view of her condition, damage was done to the Fred Grube which eventually resulted in her increased leaking and eventual filling and sinking.

III. The Fred Grube was old and in a weak condition and liable to serious injury from a comparatively light shock or blow, and this condition was well known to her master and owner and was not known to the captain of the tug.

IV. It was the duty of the several masters of these boats which made up the tow, in the presence of the wind and current, tending to set or drift them in on this boom, and the boom and in the absence of a helper, all of which was known to them, to use their tillers to keep, or aid in keeping, the boats off or away from the boom; but the master of the Fred Grube, located as he was in the tow, with only 12 feet of line between his boat and the boat ahead and the same length of line between his boat and the one in the rear, could not alone and of himself by the use of his tiller have kept off the boom, but he might have lessened the severity of the collision to some extent.

V. The collision did more damage to the Fred Grube than was known and apprehended at the time by its master in charge, and he did not notify the captain of the tug of his real condition, of the character of the boat as to age and weakness, or of the severity of the collision or of his increase in leaking. He conveyed no information to the captain of the tug which made it the duty of that officer to go on board the Grube and examine her injuries or not proceed on the voyage with her in tow. He was not then called on or required to cut her out from the tow or beach her in shallow water and was not guilty of any negligence in not then examining her or removing her from the tow and beaching her. The master of the Grube did not apprehend or realize the extent of the damage or effect of the blow in weakening her. Ordinary inspection at that time would not have disclosed the full extent of the damage.

VI. But the master of the Grube did know that the shock of the collision was severe; that it had done some damage; opened up a seam above the water line; bulged the deck more or less and caused some considerable increase in her leaks and that they were liable to still further increase; and he was negligent in not informing the captain of the tug of these facts.

VII. If the captain of the tug had been informed of the actual and visible conditions, he could have taken proper measures to remedy the leaks, plan a watch, or even beach the boat then or at the first favorable opportunity. He was misled into inaction by the carelessness of the master of the Grube. It is presumed he would have done his duty in these regards had he been fully informed of the conditions known to the master of the Grube.

VIII. In view of the actual condition of the Grube known to its master after the accident, he was negligent not only in failing to notify the master of the tug fully but in going to bed and to sleep at half past 10 that evening under the known weather conditions and in failing to keep a watch, or calling for assistance to keep a watch, and in failing to keep his boat with such a leak pumped out. He knew, or should have known, what the master of the tug did not know and had no reason to apprehend, that the Fred Grube was liable to gradually fill; that under the strain of the heavy seas in the more open parts of the lake the leaking was liable to increase, the boat fill and sink. The master of the Grube was negligent in not keeping on watch himself or keeping a watch so as to give timely warning to the tug by signal or otherwise in case of a dangerous increase in the leaks.

IX. If a proper watch had been kept, the increased leaking would have been discovered in time and the tug could have been notified easily by signal and the Fred Grube beached in shallow water and most of the cargo saved as well as the boat itself. In short, by the exercise of due and even ordinary care on the part of the master of the Grube, the damage could and would have been much decreased.

X. The evidence shows the character of the shores, of the lake to have been such that beaching in shallow water was practicable.

XI. The evidence does not justify a finding that the damage to the Fred Grube in the collision was such, or of such a nature or character, that her sinking was inevitable. If a proper watch had been kept and the increased leaking observed, as it must have been, and a proper signal given to the tug, the captain of the tug could and presumably would have come back and assisted in pumping the Grube out in case her master was unable to keep the water down. If pumping would not have saved her, then beaching would have lessened the damage or loss.

XII. I find that it is negligence for the master of a boat forming one of a tow in deep water and quite a sea, and which boat has been quite recently injured so as to considerably increase her leaks and bulge her decks and open her side above the water line, to go to bed and to sleep, leaving no watch and no one to care for the boat.

XIII. Under the circumstances disclosed in tne evidence, the captain of the tug was not negligent in not placing a watchman on the Grube, and on that dark and misty night no watchman on the tug could have discovered the danger of the Grube because of the increased leaks.

The remaining question is: Who must bear the loss? I think it a case where the master of the tug was primarily in fault, the damage to the boat resulting mainly therefrom, but that the negligence of the master to some extent contributed to and increased such injury; and that the loss and damage to the owners of the cargo and to the owner of the boat and consequently to the insurers was largely contributed to and increased by the negligence of the master of the Grube, for which the captain of the tug was in no way responsible. It is a case where the loss of the boat ought to be divided and part borne by the transportation line, the tug, and part by the owner of the boat. I can see no justice in placing the whole burden on the tug or its owners. As to the cargo of coal, the transportation line, the tug, must bear a part of the loss in any event. Should it bear the whole loss? Must it bear the consequences of the negligence of the master of the boat on which was placed this coal for transportation?

It seems that Charles Gordon, the owner of the Fred Grube under a contract of sale, not paid up in full, was insured with the Western Assurance Company of Toronto, Canada, libelant, in the sum of $900 on the boat, "loss if any, payable to J. P. Tyler as his interest may appear," and that claim was made and $775 paid by the insurance company. It also seems that Gordon received from the Delaware & Hudson Company on board this boat 191½ tons of egg coal April 23, 1909, which he promised to deliver in good order (dangers of the

sea excepted) to Carbray Son & Co., at Quebec, Canada, and that the British & Foreign Marine Insurance Company, Limited, of Liverpool, libelant, insured for account of Carbray Son & Co., owner, said cargo of coal loaded on said Fred Grube in a sum equal to the value thereof. That claim of loss was made and that said British & Foreign Marine Insurance Company paid the value of such cargo, $1,082, less $82.30 net salvage on such cargo, or the sum of $999.70.

The claim in the respective libels is that, by reason of such loss, insurance, and payment, the libelant became subrogated to the rights of the owner. The claimant Lake Champlain Transportation Company is the owner of the Robert H. Cook, and, in regard to loading the boat Fred Grube with this coal, the evidence shows that J. J. Manville was in the employ of the Lake Champlain Transportation Company as its shipping clerk to look after the shipping, and that Gordon, owner of the Grube under the contract of purchase, and Tyler, the real owner, applied to him to load the boat. Manville inquired if the boat Grube was insured and was informed that she was. He then gave orders to load her, and this was done. Manville had no other knowledge of the condition of the boat and made no examination or further inquiries. The transportation company was furnishing the boats to transport this coal going in this tow then being made up. Still the actual relations of the parties is not apparent.

The Robert H. Cook has made no offer or tender, so far as appears, but has denied all liability in each case. I think the steam tug Robert H. Cook is properly liable for one-half the loss on the cargo, $999.70, or $499.85, with interest thereon from the date of such payment and possibly for the whole thereof, and for one-half the $775 paid as loss on the boat Fred Grube, or $387.50, with interest from the date of such payment in case it is conceded those sums respectively were the face value of cargo, less salvage and boat. But of course the claimant is not bound by such payments made by the libelants and may contest such values. As no offer was made, I think the Robert H. Cook properly charged with taxable costs.

If the parties do not agree on *such* damages or *the* damages, it may be referred to J. Ward Russell, Glens Falls, N. Y., as master to take proof thereof and report, and also as to the actual relation between the Robert H. Cook, or the said transportation company, and the owners of the coal and the insurer and the owner of the boat in the matter of transporting this coal.

In the case The Transfer No. 8 (D. C.) 88 Fed. 551, the barge M. in tow of the W., by the mutual fault of the W. and transfer 8, was so damaged as to be in a sinking condition and was thereafter taken by the W. into deep water, where she sank. Judge Brown held the W. solely liable for the damage to cargo after the collision to the extent of $1,000 on the ground that the W. had actual notice or knowledge of the sinking condition of the barge. I do not find anything in this case to change the conclusion to which I have come.