CROSBYTON INDEPENDENT SCHOOL DIST. v. C. B. LIVE STOCK CO.

(Circuit Court of Appeals, Fifth Circuit. December 20, 1918. Rehearing Denied February 1, 1919.)

No. 3223.

SCHOOLS AND SCHOOL DISTRICTS ⊙⊸70—CONTRACTS—VALIDITY.

A contract by a school district for the purchase of a school building *held* invalid, on the ground that the building purchased did not conform to the requirements of the state law as to light, ventilation, and safety, and was not susceptible of changes which would meet such requirements.

Appeal from the District Court of the United States for the Northern District of Texas; George W. Jack, Judge.

Suit in equity by the Crosbyton Independent School District against the C. B. Live Stock Company. Decree for defendant, and plaintiff appeals. Reversed and remanded.

W. H. Kimbrough, R. E. Underwood, and M. J. R. Jackson, all of Amarillo, Tex., for appellant.

J. W. Burton, of Crosbyton, Tex., for appellee.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

BATTS, Circuit Judge. The C. B. Live Stock Company, owning a large body of land in Crosby county, Tex., sold it out in small tracts to actual settlers. Through a subsidiary company, the town of Crosbyton was established. In 1909 an independent school district was formed under the general laws of Texas, with the maximum territory. It was impracticable, with the taxable values and under the taxing power of the district, to construct a satisfactory school building, and 39 of the citizens executed a note for $10,000 to secure funds for the erection of such building. It was the understanding that the Legislature would be asked to create, by special act, an independent school district with an enlarged area, and that the district would discharge the debt. The note was sold to the C. B. Live Stock Company. A building was constructed; the construction being in the hands of trustees selected by the signers of the note. The $10,000 provided, in part used for other school purposes, was insufficient, and an additional sum was borrowed to complete the building and meet debts contracted in the operation of the school. The trustees for the note signers made a contract with the trustees of the independent school district, by which the latter agreed to pay (if possible) the interest on the $10,000 note as rent for the school property. The lot upon which the building was erected was furnished by the C. B. Live Stock Company, with the understanding that it was to ultimately become the property of the school district. A special act was passed in 1913 (Acts 33d Leg. c. 20), creating the independent district, to include within its area about 120 sections, and in other respects giving to it the powers of a school district under the general law.

After the formation of the district under the special act, a petition was filed by the requisite number of taxpaying citizens for an election, to determine whether or not bonds should be issued to "provide funds to be expended for the purpose of purchasing a school building of concrete material," and. "to determine whether the trustees of said district shall be authorized to levy, assess, and collect annually" a tax, etc. On September 24, 1913, the board passed a resolution in the following language:

"On motion, the board ordered an election to be held November 1st, for the purpose of voting on the issuance of eighteen thousand dollars bonds to buy the school 'building and grounds. Bonds to be 40-year bonds, with 5 per cent. interest, with the privilege of redeeming after 10 years."

On November 22d an order was made to this effect:

"On motion, it was ordered the election returns were examined on the school bond election held November 1, 1913, and found to be 47 votes for the issuance of the bonds and 34 against it, with 13 majority in favor of the bonds, and so declared."

Subsequent to the election, an election order was adopted and submitted to the Attorney General as a part of the record, wherein an election was ordered to determine if bonds to the amount of $18,000 should be issued "to provide funds to be expended in the payment of accounts legally contracted in the purchasing of a building of concrete material, to be used as a public school building, and to determine whether the trustees of the district shall be authorized to levy," etc., a tax. At the same time, and after the entry of the order actually adopted declaring the result of the election, an order was prepared canvassing the return, and declaring the result of the election, and declaring that 47 votes had been cast for the bonds and 37 against, and in addition declaring that 47 votes had been cast for the tax, and 34 against. It was certified that these orders had been passed on September 12, 1913, and November 20, 1913, respectively. The record thus prepared was submitted to the Attorney General, and the bonds were approved. On April 8, 1914, a resolution was passed to the effect that all the bonds be delivered to the C. B. Live Stock Company as the purchase price of the school building, equipment, and grounds; but it was provided that, if the C. B. Live Stock Company could sell the bonds at par to the state, it would retain of the proceeds $17,932.27 only, and return the balance to the school board. A contract to the same effect was signed by the parties. The bonds, however, were sold direct to the state, and the treasury warrants received in payment were turned over to the C. B. Live Stock Company.

The $17,932.27 was made up of the following items: Note, $10,000; interest, $2,890; note of August 3, 1911, $3,991.61; interest, $778.66; insurance premiums, $272. The note for $3,991.61 was given to cover items for material used in the construction and for money to cover deficits in the operating expenses of the school.

At the time the resolution was adopted by which the building was to be purchased, and as the result of which the notes were to be delivered to the makers, six members of the board were present, three

of whom were signers of the notes, and another of whom was an employé of the C. B. Live Stock Company.

Parol evidence was admitted to the effect that the understanding of the voters at the bond and tax election was that the school building and grounds were to be acquired with the bonds and that the citizens who had signed the notes were to thereby be released from their personal obligations.

Appellant contends that, because of the personal interest of members of the school board, the action by which the C. B. Live Stock Company acquired the proceeds of the bonds was void.

Appellee answers that the action of the school board was in response to the will of the people; that the trustees had, with reference to the issuance of the bonds and the purchase of the building, no discretion; and, exercising ministerial functions only, their action was not invalidated by the interests of members adverse to the interests of the school district.

To the answer of appellee, appellant rejoins:

(1) That whatever the wishes of the voters, it could not have been the duty, nor within the power of the board, to issue the bonds or purchase the building, because: (a) The building purchased could not be legally acquired because not constructed to meet the requirements of the law with reference to light, ventilation and safety; (b) bonds may not be constitutionally issued by an independent school district to purchase a building; (c) the constitutional taxing power had already been appropriated, and no provision could be made to provide for payment of interest, and to create a sinking fund to discharge the bonds at maturity; (d) the voters did not vote for the necessary tax.

(2) That no action could be taken by the voters that would relieve the trustees of the duties imposed upon them by law, and render that ministerial which is by law placed within their discretion.

(1a) The building purchased was not constructed in accordance with the requirements of the Texas law. No provision was made by the bond issue, by the contract, or otherwise, for making changes to meet the requirements of the law. The building was not susceptible of changes which would meet these requirements, and there was nothing in the evidence to indicate that changes of any kind were contemplated. My associates agree with the conclusion reached that these facts would invalidate the purchase and furnish a sufficient basis for the judgment hereinafter rendered. The discussion of the other issues is an expression of the views of the writer alone. I prefer to base my action upon what are to me definite and well-established principles, rather than upon a proposition which is, I think, correct, but which has not heretofore been announced by a court.

Appellee insists that, while a school board cannot erect a building without complying with the requirements of the law, a defective building can be purchased. And it is said that inasmuch as there were, when the law was passed authorizing the purchase of buildings, no buildings which complied with the law, to apply the requirements to purchased buildings would nullify the law authorizing purchase. The law has a continuing effect. It applies to buildings in being at the time

of the passage of the act, and to buildings to be thereafter erected. By the terms of the specific act, or any other act dealing with the matter, the character of the building to be purchased may be indicated. It is immaterial which act was passed first. The acts are not in conflict, and to hold that a building may not be erected unless it meets the requirements of the law, but that one may be purchased without reference to the requirements, is to render a salutary law nugatory by a conclusion not logically warranted.

(1b) Article 7, § 3, of the Constitution of Texas, provides:

"That the Legislature may authorize an additional ad valorem tax to be * * * collected within all school districts * * * for the further maintenance of public free schools, and the erection and equipment of school buildings therein."

It is contended that authority to tax for the "erection and equipment of school buildings" does not include authority to tax to purchase school buildings. The Legislature of Texas has given the provision a more liberal construction. The Texas courts appear not to have passed upon the matter, and, since this case can be disposed of upon other grounds, their decision will not be anticipated.

(1c) The taxing power of an independent school district is limited by the Constitution of Texas to 50 cents on the $100. At the time the enlarged district was established there was a vote in favor of a tax of 50 cents on each $100 valuation of taxable property, to be levied for the year 1913, and each succeeding year, "to supplement the state and county apportionment of said district." It is not clear that a vote of the maximum tax to supplement the other revenues of the district precludes a subsequent vote appropriating a part of the tax to the acquisition of necessary buildings and equipment.

(1d) Under the Constitution of Texas, municipal bonds cannot be legally issued, unless at the time of issuance provision is made by taxation to pay interest and create a sinking fund to discharge the bonds at maturity. Action by trustees in a school district to make such provision must be preceded by a vote of the people in favor of the tax.

The minutes of the school board already quoted, providing for the bond election, do not refer to a tax election. The minutes already quoted, declaring the result of the election, make no reference to votes cast for or against taxation. The order certified to the Attorney General as the election order was not prepared until after the election. The order certified to the Attorney General as declaring the result of the election supplemented the result primarily declared by adding the result of a tax election. The order for the election is the basis for the election, and all subsequent proceedings. There is no evidence, other than the certificate, that the election order certified to the Attorney General was passed before the election; and there is no evidence, other than the certificate, that a tax election was held at any time. The verity of the certificates is attacked by the person who made them. Minutes may be amended to speak the facts, but the evidence in this case rather suggests anxiety to "get up the proper minutes for the Attorney General" than to make the record veracious.

Appellee insists that the question of whether or not the certificates speak the truth "is foreign to this case," upon the ground that the bonds belong to the state of Texas, and their validity cannot be impeached. Both parties seem to acquiesce in the proposition that approval by the Attorney General and purchase by the state preclude attacks upon the bonds. Assuming this to be true, the inquiry is not an improper one, for it could not have been the duty, nor within the authority, of the board to issue bonds to purchase a building, or for any other purpose, if the necessary tax was not authorized. That cannot be a ministerial duty, or a duty of any character, which is a violation of law.

(2) The effect of the contract made by the school board with the C. B. Live Stock Company in the form of a purchase of the building and grounds was to release (or was intended and assumed to release) three of the members voting for the measure from personal financial obligations. Six members only were present when the resolution authorizing the contract was adopted. The action of the board was void, unless the effect of the election was to make the action of the trustees merely ministerial, and to take away from them entirely any character of discretion. It is not possible to give the language of the law under which the school trustees were acting a construction that would authorize or enable the voters to relieve the school board of the duties and obligations thereby imposed. Article 2857, Rev. St. Tex. 1911, provides that the trustees of a school district shall have the power—

"to levy and collect an annual ad valorem tax not to exceed fifty cents on the one hundred dollars valuation of taxable property of the district, for the maintenance of schools therein, and a tax (within the fifty cents) not to exceed twenty-five cents on the one hundred dollars for the purchase of sites and the purchasing, construction, repairing or equipping public free school buildings within the limits of such districts."

A number of provisos or limitations are placed upon this power, among them being:

"No such tax shall be levied, and no such bonds issued until an election shall have been held, wherein a majority of the taxpaying voters voting at said election shall have voted in favor of the levying of said tax and the issuance of said bonds, or both, as the case may be: Provided that the specific rate of taxes need not be determined in the election."

The exercise of the power of taxation is in the trustees, and not in the voters. Before the power can be exercised by the trustees, the voters must indicate their willingness that it be exercised. The purpose of the law is to limit the taxing power in any event, and not to permit its exercise without the concurrence of the qualified voters. But, under the terms of the law, the discretion is in the board. The authority which they are given by the law and the action of the voters need not be exercised, and, if exercised, the limit of the authority need not be reached. Under the Constitution the total amount of the tax can never exceed 50 cents on the $100, and the building tax cannot exceed 25 cents on the $100. It may be practicable to so reduce the building tax that a considerable part of the maximum of 25 cents may be available for the maintenance of the schools, or the conditions may be such that the maximum tax of 50 cents need not all be utilized.

When, therefore, the people of the district registered their willingness that bonds should be issued, and that a tax should be levied providing for their payment (if they did), and making the issuance possible, this action did not take away from the trustees the duty and obligation to determine whether bonds should be issued, and to what amount, and whether a bond tax should be levied, and the amount required.

Nor did it take away the duty to administer the property of the district to the best advantage. There is nothing in the language of the act to indicate that the general power of management by the trustees is limited by a right of the voters to name some specific building to be purchased, or to specify some particular plan for the erection of the building. Nor is there anything in the act which would suggest that a certain price must be paid for a building, if one is to be purchased, or that a building to be erected should reach a certain cost. The voters place a maximum to be expended, and the duty remains in the board to do the best possible for the district, without exceeding this maximum. When in this case the people registered a willingness to issue bonds for a school building, and pay taxes to liquidate the bonds, they expressed themselves as far as the law will permit. If by their vote they undertook to do more, the effort was entirely without effect.

It is argued that the views here expressed are in conflict with Grayson County v. Harrell (Tex. Civ. App.) 202 S. W. 160. This case involved the duty of the commissioners' court, when an issue of bonds was voted by a county for road purposes. The difference between that act and the one under consideration is that the commissioners' court of the county is, with reference to the particular matter, without discretion. The voters of a county having voted bonds for the construction of roads, the law specifically, distinctly, and in mandatory language indicates what shall be done by the commissioners' court. All of the cases cited to sustain appellee's proposition deal with laws distinguishable from the law under which the trustees in this case acted, by the fact that, instead of removing a limitation upon the authority of the board, the election imposed, in terms, mandatory duties. There is, of course, no discretion upon the part of a governing body, when the discretion is, in terms, taken away by the law.

Parol evidence was introduced as to the purpose and understanding of the voters. The people acting at the polls (the only manner in which they may indicate their wishes under the laws of Texas) can express themselves only in the terms of the law. No amount of parol evidence can add to or take away from the results of the election. The parol evidence was specific as to a very limited number only of the electors, and if the intentions or understanding of the voters, or a majority, were a material matter, it would be properly held that the evidence was insufficient. If the good faith of the trustees were properly an issue, the evidence admitted would authorize the conclusion that each of them believed that a majority of the voters believed that the district should relieve the note signers of their liability, and voted to accomplish that end. While it may be true, and, indeed, is doubtless the case, that in voting upon the issuance of bonds the voters in the Crosbyton school district expected and intended that the bonds

should be used in discharging their fellow citizens from obligations which they had incurred for the general benefit, yet this action on their part could not have such effect, and could not place upon the school board any duty they did not theretofore have, and could not furnish an excuse for the school board if, acting upon this assumed authority, it did that which the law did not authorize.

All of the members of the school board testify that at the time the schoolhouse was purchased it did not have value equal to the bonds. There was, indeed, no effort made to determine its value, and the sum agreed upon as the purchase price included items having no relation to its value. The building was in bad condition, and has since been abandoned. It was constructed of cement building blocks made by the C. B. Live Stock Company, and most of the lumber and hardware was furnished by the company. The concrete foundation was not properly put in, the roof was not properly designed, and the cement blocks do not appear to be a satisfactory material. There is, however, nothing in the record to indicate that the C. B. Live Stock Company, or any of the persons who signed the note, have been guilty of any character of fraud or graft, and the evidence indicates that that which was done was by all the parties intended to be for the common benefit.

At the election a number of the citizens felt that there was a moral obligation to discharge the indebtedness. Another considerable number, signers of the note, not only recognized this moral obligation, but realized that, if the community did not discharge its moral obligations, they would be under the necessity of discharging the legal obligations of the note. These considerations in no sense change the law. If the citizens of the independent school district feel sufficiently the moral obligation to discharge this debt, the law does not prevent them from doing so. School districts, however, are not organized for the purpose of discharging moral obligations; and the law does not authorize all of the voters to relieve some of the voters of the consequences of handling in a way not authorized by law the affairs which they have undertaken for the public. An independent school district is a governmental unit, devised by the state for locally discharging a governmental duty. Its powers are strictly defined by the law, and strictly limited by the law. Everything which may be done is, in terms, defined, and nothing may be done for which direct and express authority is lacking. It gets all its authority from the state of Texas. Its taxing power is not even within the control of the Legislature.

All taxing power within the state is immediately and directly indicated by the Constitution. The limit of every tax is defined, and the purpose for which it may be levied is specified. The debt-making power is likewise defined and limited by the Constitution. No school district has a right to make a debt, except as the power is given by the Constitution. No school district has a right to levy a tax, except as the power is given by the Constitution. No school district may make a debt allowed by the Constitution, unless provision is made to discharge it by the tax authorized by the Constitution.

The district may incur a debt only for a building and equipment. The debt which the appellee has gotten the benefit of was incurred

only in part for a building, and this part had no relation to the value of the building. More than $3,000 of the amount is interest, at a rate not authorized to be paid by a school district, on obligations which the school district had not incurred, and which it had no right to incur. Another considerable item going to make up the total amount was to meet deficiencies in the current operations of the school. The law does not authorize the issuance of interest-bearing bonds to meet obligations of this character, and does not authorize the incurring of such obligations.

The proposition is made that, however invalid the action of the board might otherwise have been, it was directly authorized and affirmed by the voters. To sustain this proposition, appeals are made to the principles of law applied to private corporations. It is manifest that if, by concerted and unanimous action, the voters in any municipal corporation could impose upon themselves obligations which the law did not permit, they would be able to substantially and effectively repeal all limitations upon their taxing power or their debt-making power, and all limitations upon any other power which the Legislature or the Constitution makers may have thought proper to impose. Private corporations are made by individuals for their individual ends. When those individuals act, they are bound, even if they go further than they expected to go when they limited themselves by the powers given to the corporation. They are the source of authority, and the authority given may be enlarged, or an unauthorized act may be ratified. The voters of a school district are not the source of power of the district. The source of power is in all the people of Texas, who, through their Constitution and laws, give a strictly limited agency to the voters of the district.

In this matter it is not even suggested that liability has been imposed by unanimous action of the persons affected. Of the persons who voted, 37 voted against the levy of the tax (if a vote was had upon that proposition) and 34 voted against the issuance of the bonds. The majority of 13 in favor of the bonds was not equal in number to the persons who had an immediate and direct interest in their issuance, and the evidence is that many of these interested persons were active in their efforts to carry the election. It is not shown that a majority of the disinterested voters favored the bond issue. But, if all the voters had voted in favor of the bond issue and the taxation, there would still be many interested persons affected by the taxation and the bonds who cannot be said to have given their concurrence. The tax to be levied was made applicable to 120 sections of land, together with all personal property within that area. The area to be affected was nearly five times as large as is ordinarily thought proper to put within a school district. It is more than probable that many taxpayers within the district were without a right to vote. It is very probable that the owners of much of the property resided outside of the district. The women within the district, greatly interested in the prosperity of the schools, had nothing to say about whether or not a useless piece of property should be purchased. The children of the dis-

trict, more interested than any one else, were without a voice in the decision that would affect their own children.

The testimony is to the effect that within the town of Crosbyton there were 800 or 900 people. If the insistence of the appellee is to be effective, 47 of the number are to bind all of the 800 or 900, and all that are to follow them for 40 years, although many of the 47 are adversely interested to the general good. It is indeed true that this small minority may, to the extent authorized by law, speak for all the citizens. They can remove one of the limitations imposed upon the board. But the power which they exercise is not inherent. It does not come from the school district, but from the Constitution, made by all the people of Texas, and the laws made by the representatives of all the people. This minority, being a majority of the taxpaying citizens, may, with reference to the bonding and taxing power, do all that may be done by unanimous action. But neither a minority, nor a majority, nor all the people of the district, can change the laws of Texas—substitute a new plan for effecting the education of the children of the state, or in any degree increase the powers or diminish the duties of the trustees selected in accordance with law to represent, not alone the district, but all the state.

The school board was charged with the duty of determining how the $18,000 in bonds voted by the majority of the taxpayers should be expended. It was the duty of those of the members of the board who had interests adverse to the district to abstain from voting; and, there not being a quorum of persons who could exercise the free, independent, unbiased judgment which the law requires, it was not possible for this particular board to make the contract which they undertook to make with the C. B. Live Stock Company. Efforts upon the part of city and county officials to deal with themselves are denounced by the penal statutes of Texas. While the penal provision is not specifically applicable to school trustees, the absence of the penalty does not prevent the inherent illegal character of the transaction. It is not necessary to determine whether such a transaction is void, or merely one which may be voided. It is fundamentally and definitely opposed to public policy, and should, perhaps, be looked upon as having no character or standing—as being void. But, if the contract is merely voidable, the result is the same. This is, in effect, a direct action to set aside the transaction and restore the parties to the status which they had prior to the illegal contract.

For the respective reasons indicated, the contract with the C. B. Live Stock Company is held invalid, and judgment is reversed and the cause remanded, with directions that judgment be rendered for the Crosbyton independent school district against that company for the amount sued for, with interest and costs.

Reversed and remanded.