THE WEST HARSHAW.

THE ANSALDO SAN GIORGIO SECONDO.

UNITED STATES v. SOCIETA NAZIONALE DI NAVIGAZIONE.

No. 58.

Circuit Court of Appeals, Second Circuit.

March 5, 1934.

Loomis & Ruebush, of New York City (Homer L. Loomis, of New York City, of counsel), for claimant-appellant.

Martin Conboy, U. S. Atty., of New York City (William E. Collins, Sp. Asst. to U. S.

Atty., of New York City, of counsel), for libelants-appellees and cross-appellants.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This action was brought against the Italian steamer Ansaldo San Giorgio Secondo by the United States, as owner of the steamship West Harshaw, and by the master, officers, and crew of the latter vessel, for salvage services which the West Harshaw is alleged to have performed on behalf of the Italian steamer after her steering chain was broken in a storm at sea off the east coast of Florida on July 26, 1926. The left chain of the rudder of the Ansaldo broke at about 8 p. m. at a point some eight miles southeast of Hyllsborough Inlet, rendering the ship unmanageable. At the time the ship was caught in a tropical hurricane, and the force of the wind and sea tended to drive her towards the land. Her hand steering gear was broken by the seas, and while, by the alternate use of one or the other of her two propellers, she was able to maintain partial control over her heading, she was in serious danger and considered that such was the case, for, at 10:40 p. m. on July 26, she sent out an S O S. As appears by the log of the Ansaldo, the American steamer Orizaba answered that she was coming, and at 2 o'clock hove in sight and asked the crew of the Italian steamer to abandon ship. They replied in the negative, but requested the Orizaba to keep herself in communication with them. The following are the pertinent entries in the log:

"July 27

"* * * Meanwhile we continued in more desperate attempts to fix the helm, but all exertions were in vain. In the morning the hurricane had reached its greatest force. We are near the center and in the dangerous semicircle. The deck is constantly swept by heavy waves. From this time all orders between the bridge and the engines are impossible.

"With the view to try to diminish the force of the waves, naphtha was pumped overboard and oil sacks used.

"Various steamers nearby have made useless attempts to approach.

"Towards 10 o'clock the wind, at its strongest, turned gradually from N.E. to N-N.W.—W-S.W.—the barometer registering the minimum point (735%). We now presented the starboard side and the vessel careened towards N.E.

"The terrible seas had meanwhile smashed the bridge aft, the chain lashings of the deck cargo, wrecking and sinking the other life boats.

"July 27

"The lumber loaded on deck now broken adrift and shifted by the furious waves threatens to stave in hatch #6 and doors at entrance to engine room.

"Our conditions are desperate—the crew is exhausted.

"The steamers continued trying to approach in vain, also because of the very heavy mist.

"Such desperate conditions continued all day and all night.

"At 23:30 the American steamer West Harshaw arrived advising that it would stand by at our side."

Three S O S calls were sent out by the Ansaldo. Though the Orizaba seems to have been willing to take off the crew, if that became necessary, when she found that the master of the Ansaldo was not prepared to abandon ship, she decided to go on her way, for she had mail and passengers on board. After the Orizaba had gone on, a call for assistance directed to her was picked up by the Harshaw, who sent a radiogram to the Ansaldo: "Are you still in need of assistance?" This was answered in the affirmative by the master of the Ansaldo. The Harshaw thereupon steamed ahead right into the area of the hurricane, and at last reached the Ansaldo as quickly as wind and waves and a low visibility would permit. When she finally came up to the Ansaldo at almost the height of the storm, the lighting system of the latter was out of commission, she was lying in the trough of the sea, drifting helplessly, the waves breaking over her and all her lifeboats smashed or swept overboard. The Harshaw went to her windward side so as to shield her so far as possible from the severity of the hurricane and there stood by the rest of the night. About daybreak on July 28, the Harshaw attempted to throw a cable aboard in order to tow her until she could repair her broken rudder chain and get in a condition where she could control her movements. The Harshaw first attempted to shoot a line over, but the gun broke. The Harshaw then adopted the expedient of floating a line attached to a barrel across her bow. To do this, it was necessary to circle about her for hours which was a dangerous maneuver, as the Ansaldo could not go astern on her engines and a collision might readily occur. Finally the

Harshaw succeeded in attaching a towing cable, 120 fathoms long, to the Ansaldo's anchor chain, having a length of 75 fathoms, and towing commenced at 1:20 p. m. on July 28. This continued until 11:40 p. m., when the line broke because of an uneven strain, and the 120 fathoms of towing cable and the 75 fathoms of anchor chain dropped into the sea. It then became necessary for the crew of the Ansaldo to haul the line aboard her. After they had done this, a crew of volunteers from the Harshaw lowered a lifeboat and carried a coil of manilla rope to the Ansaldo so that the broken towing line might be hauled from the Ansaldo to the Harshaw. They did this in the night, with a heavy swell running. The wind was still strong and the sea high from the recent hurricane. The work took nearly three hours and was dangerous and involved skill and courage of a high order. The connection between the vessels was then re-established and towing resumed at 6:15 a. m. and continued until 11 a. m. on the 29th. This last towing was only with the anchor chain of the Ansaldo which was too short for use as a towing line and made progress very slow.

■ During the morning of the 29th, the Ansaldo had been able to repair her rudder chain in the quieter seas and announced her purpose to proceed to port under her own steam. She did this, and, while the Harshaw went along with her and claimed that this was done under an agreement that she should act as a convoy, we cannot see that this service if rendered under any contract was of value, and are not satisfied that there was a contract with the Harshaw to convoy the Ansaldo. The master of the Harshaw obtained from the master of the Ansaldo a written statement that the Harshaw had towed the Ansaldo when the latter was in distress. This was secured when the Ansaldo decided to be towed no longer. It contained the following clause which tends to negative any arrangement to convoy:

"To the Master of the S. S. West Harshaw —I do not need a tug any more. I can go full speed under my own power and can steer my own ship and do not need any assistance and can proceed on my voyage without assistance."

If the Ansaldo had arranged for convoy, it is most unlikely that the arrangement would not have been mentioned in the statement by her master. This inference is fortified by the consideration that the convoy was of no value to the Ansaldo. The contention that she needed a convoy because of new storm warnings and a possible recurving of the hurricane, which never in fact occurred, is contradicted by the probabilities of the case. It is denied by her master and negatived by his written statement.

The Harshaw traveled 120 miles in reaching the Ansaldo and towed her 145 miles. She convoyed her 74 miles after she ceased towing and spent on the entire service one day and twenty-two hours. The value of the Ansaldo was $200,000, and the value of her cargo was $300,000. The District Court found the services were worth as a whole $20,000, and that $8,000 should be awarded against the Ansaldo for two-fifths of the salvage that was attributable to that vessel.

■ We cannot agree with the appellant that the Harshaw performed no more here than ordinary towage services. She seems to have been the only vessel willing to go into the worst area of the hurricane to render substantial assistance to the Ansaldo. She could have kept back and avoided much of the severity of the hurricane, but came to the rescue and undoubtedly did this at the call of the Ansaldo. The Florida Straits are only about sixty miles wide at this point and the danger that the Ansaldo might drift upon the Florida coast when the wind blew in that direction and, after it shifted, might be wrecked on the other side of the Straits, was considerable seeing that she had become practically helpless owing to lack of any rudder control. The storm had only just passed its height when the Harshaw reached the Ansaldo and was still exceedingly severe. The seas would remain rough and dangerous long after the wind abated. The maneuvers of the Harshaw in order to pass the towing line were all under the worst weather conditions, and the towing itself, in such circumstances, was bound to be a strain on the Harshaw and her equipment. The members of the crew, who volunteered for the lifeboat after the towing line parted and worked in darkness and in heavy seas to pass a new line to the Ansaldo and to make her anchor chain available for the second towing service, were courageous and skillful, and were engaged in a hazardous adventure. The criticism of the salvage services because the towing line broke, as frequently happens in heavy seas, seems unfounded and certainly is not sufficient to deprive the salvors of a fair award. The Kanawha (C. C. A.) 254 F. 762. The Harshaw came to the rescue of the Ansaldo, stood by for a night when she was helpless and her lifeboats were gone, and then towed her

through high seas until she was able to repair her rudder chain and the winds and waters had quieted down.

 We should not disturb the award of the District Court, even though it was perhaps somewhat more liberal than we might give where the service lasted no longer than it did, if it had not included as a basis the convoying of the Ansaldo to port after the towing ceased. The inclusion of these services seems to us unfounded. In the circumstances we think that the salvage award should be $15,000, two-fifths of which, or $6,000 (as the salvage claims against the cargo are not here involved) should be attributed to the Ansaldo. The award should carry interest as in Huasteca Petroleum Co. v. 27,907 Bags of Coffee (C. C. A.) 60 F.(2d) 907. A contrary result would deprive the salvors of their award for nearly eight years without any compensation to them for what is in substance the use of their money by the claimant.

The decree is so modified as to award to the United States of America, the owner of the West Harshaw, $6,000, with interest thereon at 6 per cent. per annum from July 30, 1926, to the date of the decree to be entered hereon, together with the costs that have been taxed in the court below amounting to $534.90 and interest. The award of $6,000 to the extent of $1,600 and interest shall be distributed by the United States to the master, officers, and crew in the same shares fixed by the District Court in respect to the $1,600 allowed them in the former decree.' The remainder shall be retained by the United States to cover its salvage services and expenses.

The cause is remanded to the District Court for the entry of a decree in accordance with this opinion.