## THE LEWIS BROTHERS.

(District Court, S. D. Florida. February 23, 1923.)

1. **Salvage ☞34—$500 awarded for services rising little above ordinary towage.**

   Where the services for which salvage was claimed consisted of towing a schooner for 95 miles, which occupied about 13 hours' time and delayed the steamer doing the towing only about 10 hours, without requiring any substantial deviation from her course, so that the service amounted to but little more than ordinary towage, an award of $500 as salvage is sufficient.

2. **Salvage ☞38—Entire sum awarded to owner where only ordinary labor was required of crew.**

   Where the services for which salvage was claimed amounted to little more than towage, and only ordinary work was required of the crew of the towing vessel, the entire award will be decreed to the owners of the vessel.

3. **Salvage ☞21—Award for salvage held forfeited by gross exaggeration of value of vessel and cargo saved.**

   Even if the mate of a towing steamship, who had been placed on the schooner which was towed to safety and left on the schooner, performed services entitling him to share in the salvage award, he lost his right to salvage by grossly exaggerating the value of the schooner and cargo saved.

In Admiralty. Libel by Frank H. Schoo against the British schooner Lewis Brothers for salvage. Decree awarding $500 entered.

W. Hunt Harris, of Key West, Fla., for libelant.

H. H. Taylor, of Key West, Fla., for claimant.

CALL, District Judge. On February 22, 1922, the British schooner Lewis Brothers was sighted about 15 miles southeast of Carrysfort Lighthouse with her flag at half-mast. The Sabine Sun, a tank steamer of some 10,500 dead weight capacity, was on a voyage from Boston to a port in Mexico, in ballast, and was of the value of more than $1,000,000. The schooner's value was appraised at $8,000 and the cargo's at $14,000. The schooner was loaded with lumber and bound on a voyage from Pensacola, Fla., to a Spanish port. She sailed from Pensacola February 10th and encountered heavy weather which shifted the deck load a little and caused the schooner to spring a leak. It would seem that the master intended to make the port of Jacksonville

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

for repairs, but on the morning of February 22 met his death, where-upon the mate, who, from the evidence, I judge, was a man of little practical experience, decided to make Key West, and was on his way to said port when sighted by the tanker. Each of the vessels was bound on much the same course. The schooner on the approach of the tanker hoisted a signal for her to come nearer, which was done. The testimony of what passed between the master of the tanker and the master of the schooner is irreconcilable. But, whatever did pass between them, the result was that the master of the tanker sent his first mate aboard the schooner, and the crew of the schooner took a 10-inch hawser from the tanker and made it fast to the bits of the schooner, and the Sabine Sun towed the schooner to a point opposite the entrance of Key West harbor, where a pilot boarded her, and the schooner was sailed up the channel and safely anchored, the first mate of the Sabine Sun remaining with the schooner, and the Sabine Sun proceeded on her voyage to the Mexican port. The time actually consumed in getting the tanker's hawser aboard the schooner and tow-ing her and recovering the hawser at the termination of the towage was from about 3:15 in the afternoon of February 22d to about 7 a. m. of the 23d, the time consumed in the service being between 13 and 14 hours, and the distance towed about 95 miles.

The libel in this case claims $20,000 for the services rendered as salvage.

[1] The danger to the schooner of drifting on Molasses Reef is much dwelt upon, and the danger to the Sabine Sun of being rammed by the schooner during the operation of taking the hawser aboard, as well as the danger incident to the two vessels being within the "red sector" when towing actually begun. Something is also said about the velocity of the wind and condition of the sea. The fact is outstanding, however, that the officer of the Sabine Sun was transferred from the steamer to the schooner in the yawl boat of the schooner, and the smaller line attached to the hawser was carried by this same boat from the steamer to the schooner. So that, although the officer of the steamer wrote in the log of the schooner that when he boarded the "vessel pitching and rolling," and had the crew of the schooner sign said entry (this is denied by the crew), I cannot find that the weather was dangerous in any degree. The testimony impresses the thought to my mind that "salvage" was in the thoughts of the officers of the Sabine Sun from the time, at least, that the schooner was spoken, and the circumstances surrounding the service rendered were warped in the minds of the steamer's officers to make this as large as possible. Unless this is so, why leave the first officer of the steamer on board the schooner after arrival off the port of Key West, where the pilot boarded. In fact, why put the first officer aboard at all, if the vessel was to be towed off Key West. A navigating officer, the want of whom was so stressed in the original and amended libel and the testimony of the officers of the steamer, was not needed. Certainly any one capable of steering the schooner was capable of following in the wake of the steamer, and why so grossly exaggerate the value of the steamer, the schooner, and her cargo? Why was the first officer of the steamer so

particular to enter in the schooner's log, "It was understood by crew that we take full charge of vessel as salvage."

It is apparent from the testimony that the mate and crew of the schooner were glad to accept a tow to Key West, although this was not necessary to the safety of the vessel in competent hands. The acts of the master in having a portion of the deck cargo thrown overboard, followed by his death from gunshot wounds, whether self-inflicted or not, and the body still on board, was well calculated to excite the crew and make them gladly accept any suggestions made to them which indicated an early arrival at a port where the owners could be communicated with.

It is to be regretted that such cases are met with in suits for salvage, the rewards for which are large in order to encourage the risks of such service to save life and property.

I am of opinion that the services rendered in this case rise little above a towage service, and should be rewarded on a towage basis rather than salvage. The steamer was delayed in her voyage certainly not over 10 hours. No deviation from her course to mention.

No evidence was submitted as to the daily expense of operating the Sabine Sun except the list of officers and crew with the amount of their monthly wages, attached to the amended libel. But I know the expense must have been greater because, being a steamer, coal or oil was necessary to produce steam, and lubricating oil for the engines.

[2, 3] I am of opinion that an award of $500 is ample, if not generous. This amount should be awarded to the owners of the vessel. No more than the ordinary labor was required of any member of the crew, unless it be the first officer who was put aboard the schooner, and he, by the course of conduct pursued by him in the gross exaggeration of the value of the steamer, the schooner, and cargo, and of the services performed, precludes his consideration in making the award.

It is my judgment that the costs of this cause be equally divided between the libelants and the claimant.

A decree accordingly will be made.