## RODRIGUEZ v. BAGALINI.

(Circuit Court of Appeals, Ninth Circuit. March 7, 1927.)

### No. 5010.

1. **Salvage ⊚⟼48—Refusal of salvor to state amount of his claim, and bringing suit without notice, held evidence of bad faith, which should influence award.**

Where the owner of a salving boat refused to state the amount of his claim or to negotiate for settlement, but without previous notice filed a libel against the salved boat, in which he greatly exaggerated the value of each boat, the peril of the salved boat and of the service rendered, such action *held* evidence of bad faith, which should be considered in making salvage award.

2. **Salvage ⊚⟼21—False claim and false testimony to support it will justify denial of salvage award or reduction of amount.**

A false claim as to the extent of the service rendered and false testimony to support the same will justify denial of any award for salvage or reduction of the amount.

Appeal from the District Court of the United States for the Southern Division of the Southern District of California; Edward J. Henning, Judge.

Suit for salvage by Thomas Bagalini against the gas boat Mary Pigeon; Charles Rodriguez, claimant. From the decree, claimant appeals. Modified and remanded.

Harold M. Sawyer and Alfred T. Cluff, both of San Francisco, Cal., for appellant.

R. A. McKay and Shreve, Green & Shreve, all of San Diego, Cal., for appellee.

Before GILBERT, RUDKIN, and DIETRICH, Circuit Judges.

GILBERT, Circuit Judge. On September 8, 1925, the Mary Pigeon, a Diesel boat of 31 tons gross tonnage, carrying a crew of five men, was fishing about 12 miles out from Ascencion Point, Mexico. She had taken about 25 tons of fish which were piled on her afterdeck. It was discovered that water was pouring into the engine room from the top of the bait well. The bait well was a large rectangular tank for carrying live sardines, which were used for bait. It was a structural part of the boat made with water-tight partitions extending from the bottom of the vessel to the deck, with the bottom perforated with valves to permit the continuous admission of sea water to keep the bait alive. These valves were opened and closed by means of set screws operated from the deck. When they were open, the water line inside of the tank was at a level with the water line of the vessel. The tank remained unfinished in that the partitions lacked by 6 inches contact with the deck. The leakage was occasioned by the unusual load of fish, which weighed the vessel down so that water had poured over the top of the well and filled the engine room to the depth of a foot or more before its presence was discovered. The valves in the tank were then closed, and the flow of water over the top of the bait well was stopped. About one-half of the fish were jettisoned. Soon thereafter the Mary Pigeon signaled another fishing boat, the Invincible, to come to her assistance. The Invincible took the Mary Pigeon's tow line, sent two men aboard of her to assist the latter's crew in bailing out the vessel, and 3½ hours later had towed her to Ascencion Point, a distance of about 12 miles. Thereafter the Mary Pigeon transferred to the Invincible the fish which remained on her deck, the quantity of which the trial court found to be 7 tons. On the following day, the Mary Pigeon's engine being still out of commission, the Invincible agreed to tow her to Turtle Bay, about 50 miles distant. This service occupied about 8 hours. By the time it ended the Mary Pigeon had got her engine running, and she thence proceeded on her own power to San Diego.

On the suit of the appellee, the owner of the Invincible, the court below found that the services rendered on September 8th were salvage services, and therefor awarded him $1,700, and adjudged that the services rendered on the following day were towage services, for which the appellee was awarded $80. The appellant claims that the award for salvage service is grossly excessive. It is deducible from the conflicting testimony, and the court below must have so found that, at the time when the Invincible came to the assistance of the Mary Pigeon, the latter was in no great peril. The water had put her Diesel engine out of commission, but she was equipped with sails, and, in view of the weather and the circumstances, the evidence indicates with reasonable certainty that she could have proceeded to Ascencion Point in safety. The salvage service was not of a high order. There was no peril whatever to the rescuing vessel or to any member of her crew, nor did their services involve a high degree of skill.

[1] It is the settled rule that an appellate court is reluctant to disturb an award for salvage and does so only in cases where it is based on erroneous principle or misapprehension of the facts or is grossly excessive or inadequate. The Connemara, 108 U. S. 352, 2 S. Ct. 754, 27 L. Ed. 751. Following that rule, we should be disposed to affirm the award of the court below, were it not for the fact that certain features of the case which we think should have received primary consideration seem to have been disregarded. The amount of the award in a salvage case is influenced largely by the presence or absence of good faith on the part of those who claim it. The evidence here is that, after the two fishing vessels returned to San Diego, the appellee evaded the efforts of those interested in the question of the liability of the Mary Pigeon for services rendered to ascertain the amount of his claim and arrive at an understanding with him, and that, pending such efforts and his failure to respond to the same, the appellee placed his claims in the hands of his attorney, with instructions to bring a libel and seize the Mary Pigeon, which was done. It was his "manifest duty" to make known the amount of his demand and give notice of his intention before suing or seizing the vessel. The Vanloo (D. C.) 39 F. 570; The D. L. & W. No. 6c (D. C.) 53 F. 284; The Brina P. Pendleton (D. C.) 200 F. 848, 859; The Gypsy Queen (D. C.) 284 F. 607.

[2] In the present case the inequity of the owner of the Invincible went far beyond that

which was condemned in the cases above cited, for in his libel he grossly exaggerated the value of both vessels involved in the service, placing each of them at $30,000, whereas, upon the undisputed testimony, the value of the Invincible was but $20,000, and the value of the Mary Pigeon was not more than $17,-000. Again in the libel he made oath that the value of the salvage service was $10,000, and to obtain the release of the Mary Pigeon her master was required to give a stipulation in the sum of $12,500. There was gross exaggeration also in the testimony furnished by the appellee and by the members of his crew as to the peril of the Mary Pigeon, exaggeration so great as to create the impression, noted in The Lewis Brothers (D. C.) 287 F. 143, that at the time of testifying the "thought of salvage" was in the minds of all of them. A false claim as to the extent of the service rendered and false testimony to support the same will justify a denial of any award for salvage, or a reduction of the amount thereof. The Bremen (D. C.) 111 F. 228, 239; The Lewis Brothers, supra; The Gypsy Queen, supra; The Ragnarok (D. C.) 158 F. 694. We think the salvage award should be reduced to $500, and that the sum payable by the appellant on final decree should accordingly be reduced to $278.80.

The cause is remanded to the court below, with instructions thus to reduce the award, and modify the decree as above indicated, the appellant to have judgment for costs on the appeal.