**HUASTECA PETROLEUM CO. et al. v. 27,907 BAGS OF COFFEE et al.**

No. 459.

Circuit Court of Appeals, Second Circuit.

Aug. 4, 1932.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley, of New York City, of counsel), for claimants-respondents-appellants.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Chauncey I. Clark and P. Fearson Shortridge, both of New York City, of counsel), for libelants-appellants.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal in behalf of the owners of cargo from a final decree in admiralty holding 27,907 bags of coffee liable in rem and the respondents liable in personam for salvage services rendered to a cargo of coffee laden on board the steamship Pelotas, which stranded on Gallequilla Reef while entering the harbor of Vera Cruz, Mexico, on September 15, 1923. The question before us is whether the award by the District Court was excessive.

The libelant, Huasteca Petroleum Company, entered into a "no cure, no pay," salvage contract with the captain of the Pelotas. The wreck master sent to the scene of the stranding concluded that he required assistance in the salvage operations, and arranged to have the wrecking tug Warbler, belonging to Merritt-Chapman & Scott Corporation, sent to assist the Huasteca Company and its tug St. Heliers in carrying out the salvage work.

The District Court found that, in order to release the Pelotas from the strand, it was necessary to lighter the cargo into Vera Cruz; that the discharge of cargo by the salvors commenced on September 24, and continued until October 6 when the vessel was floated and practically no cargo was left on board. It was also found that "considerable skill and experience were required in the operations"; that after the cargo was removed from the vessel it was taken by the salvor to a warehouse in Vera Cruz where it had to be protected for six weeks before it was turned over to the cargo owners' representative and shipped to New Orleans. Its value on arrival at New Orleans after deducting the cost of transportation was found to be $343,000.

The court also found that the work was "diligently and under all the circumstances promptly performed," and that the cargo would have been a total loss but for the salvor's services. The value of the steamers engaged in the salvage was found to be $345,-000, exclusive of other equipment, which included four 50-ton lighters and five 45-ton lighters.

The total award for the salvage services was $68,600 in addition to expenses charged against the cargo of $27,394.13. The salvage bounty of $68,600 represented 20 per cent. of $343,000, the value of the cargo on arrival at New Orleans. This sum was taken as the value of the merchandise at Vera Cruz, because there was no market for it at the latter place and New Orleans was the nearest port where it could be sold. The expenses were made up of $14,236.38, chargeable solely against cargo; $12,595.15, the estimated contribution of cargo to joint expenses of hull and cargo connected with the salvage; and $562.60, the contribution of cargo to joint expenses of the tug Warbler in connection with salving 7,735 bags of the coffee. The claimants insist that too great a proportion of these joint expenses was charged against the cargo and that the item of $68,600 allowed as salvage bounty was too large.

The portion of the joint expenses charged against cargo was based on a valuation of the hull at $23,830 and a valuation of the cargo on arrival at New Orleans at $343,000. It is said that the cargo was not worth $343,000 at Vera Cruz because dangers from the revolution which soon broke out were such as to make export to New Orleans difficult and uncertain. Lee, an experienced surveyor, valued it at only $200,000 at Vera Cruz, but the trial judge regarded any loss of value by reason of dangers from revolution as too speculative for estimation. The owners succeeded in transporting the coffee safely, and, in view of the readiness with which it was in fact taken to New Orleans, we are not inclined to disturb the finding of the court below as to the $12,595.15.

The estimated contribution of cargo to the expenses of the Warbler amounting only to $562.50 was based upon an apportionment of expenses in the ratio that the value of the 7,735 bags salved bore to the value of the hull. Neither the amount, nor the considerations advanced in argument justify us in disturbing the finding of the trial judge as to this item.

Appellants contend that the salvage award should be very low, that the cargo was in slight danger, and that the valuable equipment employed was only obtained in the interest of the hull. It is true that the "norther" season was not actually "on." But it was almost due, and the danger of "northers" in late September and early October was not negligible. The Pelotas was stranded and lay broadside on a coral reef, with

the crest of the reef showing only about 75 feet away. The vessel and cargo were made reasonably secure while the coffee was being discharged into lighters by the beach gear laid by the St. Heliers and the further gear put out by the Warbler. It cannot be said that without this equipment the risk of loss of the cargo was not substantial and that the St. Heliers and her gear valued at $115,000 were not in danger of injury when working around the stranded vessel. Even with all the protection given by the wrecking company, a vessel lying broadside on a coral reef remained in danger from tropical storms and promptitude in discharging the cargo and good fortune as well were important factors of safety. It is to the advantage of both cargoes and hulls that there should be powerful tugs supplied with equipment suitable for salvage work in such a place as Vera Cruz, and we see no just criticism of their use on such an occasion as this.

Perhaps as things turned out the cargo from the Pelotas could have been removed without employing such an expensive equipment, but the 3½-ton beach anchors and the 75-ton blocks furnished by the salvors secured the vessel while the cargo was being discharged and probably would have prevented a destruction of vessel and cargo had a severe storm arisen. In our opinion prudence required the use of equipment that was a safeguard against such dangers not only for the benefit of the hull but of the cargo also.

It is further said that the cargo after discharge was placed in a leaky warehouse without proper dunnage, and that the coffee suffered damage accordingly. But it was placed in the only warehouse then available, and given such dunnage and so far cared for as was practicable at the time and place. So the trial judge found, and we are not persuaded that his finding was without justification.

The award of $68,600 seems to us altogether too large. While a "norther," if it came, might have broken up the Pelotas and destroyed her cargo, it did not come. There was some rough, but no seriously dangerous, wind or sea. The service required skill, experience, and promptitude, and was efficiently rendered. It did not demand fortitude on the part of the masters or crews engaged in the enterprise or involve any particular hardships. Skill, energy, and a complete and costly equipment were the main things required and supplied. To allow 20 per cent. of the value of the cargo as salvage under such conditions is to allow far more than has been customary in similar cases.

We realize that two large and powerfully equipped salvage steamers, a motor launch, and nine lighters were engaged in this enterprise, but even so a bonus of 20 per cent when the hazard was no greater is beyond reason. Little of the work of the Warbler benefited the cargo; and all but 7,735 bags of the coffee had been discharged before she arrived on the scene. We find $30,000 to be a sufficient award for salvaging this cargo.

The bounty of $30,000, like the $27,394.-13 representing expenses chargeable to cargo, should bear interest from January 15, 1924. While there has been much delay, this cause was inseparably connected with the limitation proceeding in New Orleans in which exhibits and depositions needed for trial seem to have been identical with those required here. The opinion in that case was not handed down until October, 1930. Moreover, the respondents did not put in their answer for over two years after the libel was filed. In the circumstances there was no such delay by libelants as should bar an allowance of interest.

The decree is modified so that libelants shall recover the sum of $57,394.13, with interest from January 15, 1924; costs to appellants.