**Petition of ESSO SHIPPING CO.**

**THE ESSO SUEZ.**

**THE ESSO GREENSBORO.**
**No. 1058.**

United States District Court
S. D. Texas, Houston Division.
March 19, 1954.

See, also, 121 F.Supp. 837.

Baker, Botts, Andrews & Shepherd (Denman Moody and W. C. Harvin), Houston, Tex., and Kirlin, Campbell & Keating (Raymond T. Greene and Ira A Campbell), New York City for Esso Shipping Co.

Fulbright, Crooker, Freeman, Bates & Jaworski (Carl G. Stearns and Sweeney J. Doehring), Houston, Tex., for National Bulk Carriers.

Mandell & Wright (Arthur J. Mandell), Houston, Tex., for claimants Dockrill and others.

Herman E. Cooper, Herbert J. DeVarco, and Richard Gyory, New York City, and Elias Gatoura, Houston, Tex., for claimants Williams and others.

Charles Murphy, Houston, Tex., for claimants Moore and others.

Lockhart, Watson & Peterson (Edward W. Watson), Galveston, Tex., for claimant Bellamy.

Jacob Rassner, New York City, for claimant Zickl.

Walter F. Andrews, for officers and crew of The Esso Burlington. Nathan Tanenbaum, Abbo H. Kooistra and Christian W. Tolfsby, for officers and crew of The Esso New York.

KENNERLY, Chief Judge.

Following a collision in the Gulf of Mexico on April 20, 1951, between the Esso Suez and the Esso Greensboro, two steamships owned and operated by the Esso Shipping Company, in which there was heavy loss of life and injuries to many persons, besides large property loss, the Esso Shipping Company October 4, 1951, filed in this court its petition for exoneration from and limitation of liability, Title 46, §§ 183 to 189, U.S. C.A., and Admiralty Rule 51 et seq., 28 U.S.C.A. All claims of persons for death, personal injury or property loss arising out of such collision and filed herein as required by the court have been settled by petitioner, except approximately two claims. Claims for salvage, however, have not been settled, but are disputed, and this is a hearing on the claims of numerous persons against the Esso Greensboro, and her owners and operators for salvage.

The facts are substantially as follows:

(a) The Esso Shipping Company, for brevity called petitioner, was before, on, and after April 20, 1951, the owner and operator of steamships, etc., including a number of tank steamers, which were used in transporting petroleum products, usually between ports on the Gulf of

Mexico and ports on the Atlantic Ocean. These included the Tank Vessel Esso Suez, the Tank Vessel Esso Greensboro, the Esso New York, and the Esso Burlington.

(b) The Tank Vessel Esso Greensboro, of 10,195 gross tonnage, left Corpus Christi, Texas, on the Gulf of Mexico, April 19, 1951, with a full cargo of West Texas crude oil, bound for an Atlantic Ocean port. The Tank Vessel Esso Suez, of 17,061 gross tonnage, left Baltimore, Maryland, on April 10, 1951, without cargo, bound for Corpus Christi, Texas. At about 4:20 A. M. on April 20, 1951, there was a collision in the Gulf of Mexico between the Esso Suez and the Esso Greensboro, followed by explosions, fire, and the partial destruction of both vessels, etc. There was large loss of life among and injuries to the officers and crew of the two vessels.

Also large property loss. The details are set forth in the margin.[1]

(c) The United States Coast Guard and shipping generally, including many vessels of various types, and including the Esso New York and Esso Burlington, owned by the Esso Shipping Company, took part in an effort to rescue survivors, to discover and recover the bodies of the deceased, and in an effort to recover and save property. Among the vessels which took part was the S.S. Virginia, not owned by the Esso Shipping Company, but owned by the National Bulk Carriers, Inc.

(d) The National Bulk Carriers, Inc., owner of the S.S. Virginia, filed a claim for salvage, but that has been withdrawn, and the remaining claimants are, all or some of the officers and crew of the S.S. Virginia,[2] all or some of the officers and crew of the Esso New York,[3]

1. This statement in the brief of one group of salvage claimants is adopted as substantially correct:

"The steam tanker S. S. Esso Greensboro, 10,195 gross tonnage with a full cargo of West Texas crude oil departed from Corpus Christi on the 19th day of April, 1951, bound for an Eastcoast port. The S. S. Esso Suez of 17,061 gross tonnage, without cargo and in ballast departed from Baltimore, Md., on the 10th day of April, 1951, bound for Corpus Christi, Texas. On the 20th day of April, 1951, both vessels were in the Gulf of Mexico. Both vessels were at approximately two hundred (200) miles SW of the SW pass Mississippi River at approximately 20 Deg. 17′ 26 N.–91 Deg. 25′ 30 W. going in opposite directions. While these vessels were in such position the bow of the Esso Suez struck the port side of the Esso Greensboro aft the midship housing near the No. 8 tank and cut into her for a distance of sixty feet (60′) across. (Pet.Ex.No.1).

"As a result of such collision an explosion, followed by fire, took place on the Esso Greensboro spraying the Esso Suez with burning oil from forward to aft and ignited the combustible matter and material on its deck. The explosion and fire caused substantial damage to both vessels.

"The collision, explosion and fire resulted in the loss of thirty-seven (37) members of the crew of forty-two (42) on the S. S. Greensboro, with five survivors, two

of which were injured; out of a total of forty-seven (47) aboard the Esso Suez, two (2) lost their lives, forty-five (45) survived, of which one was injured."

2. The names of the officers and crew of the S.S. Virginia who have filed claims are as follows:

Leonard N. Dockrill, Martin O. Bowin, Lewe F. Faust, Clyde E. Roberts, James L. Simmons, Paul R. Chase, Joe W. Pruitt, J. M. Schieffer, Kenneth O. Bellamy, Jay Williams, Walter L. Slodkowski, Herman F. Rossmaier, Sam Jordan, William F. Hutchins, Coy H. Helton, Otis W. Latson, Charles C. Crockett, Gabino Garcia, Manuel B. Alcalde, Benedicto S. Nunar, Luke Luethy, Thomas S. Siciliano, Harry Milnes, Ralph Chappell, K. G. Hebner, Eddie Pietsch, Cleve Edwards, Jr., Henry N. Wells, Johnnie L. Schwarzauer, Edward J. Kramer, Nicholas Hernandez, Steve Malinowsky, Sandor Bago, Aires G. Marques, Andrew Bernard, Gustave W. Portrait, Orla O. Davenport, Max E. Moore, Paul E. Fish, and George L. Zickl, Jr.

3. The names of the officers and crew of the Esso New York who have filed claims are as follows:

Abbo H. Kooistra, Christian W. Tolfsby, Johnny E. Holt, Herbert C. Schulz, August F. Freimuth, John Danko, Robert J. Miner, Theodore J. Wallace, Albert J. Gunn, Bernard Ball, Raoul Martin, William E. Nichols, Cecil Cantrell, Arnifinn Olsen, Michael Ekke, Arthur Danielsen,

and all or some of the officers and crew of the Esso Burlington.[4] Such claims are against the Esso Greensboro and against petitioner, as her owner and operator.

(e) It is undisputed that the officers and crew of the S.S. Virginia on the night of April 20–21, 1951, extinguished the fire on the Esso Greensboro, recovered approximately fifteen bodies of deceased persons thereon, made the necessary repairs or preparation to enable the Esso Greensboro to be towed, and thereafter towed the Esso Greensboro into the Port of Galveston, Texas.

(f) The second point made in petitioner's brief is as follows:

*"The details of the firefighting operation indicate that the fire was comparatively simple to bring under control and extinguish."*

I think and find that this statement is inaccurate. The Esso Greensboro carried a cargo of crude oil, and the firefighting operations were difficult and very dangerous.

(g) As has been stated, the officers and crew of the S.S. Virginia, after the fires on the Esso Greensboro had been extinguished, towed her into the Port of Galveston, Texas. On the way, the bodies of the deceased seamen were removed by Petitioner from the Esso Greensboro. Petitioner in its brief says:

*"The towing operation proceeded with the minimum of difficulty to be expected under the circumstances.*

*"The Virginia improperly refused the assistance of a salvage tug, resulting in a substantial prolongation of the towage time."*

This view is unsupported by the evidence, except that the weather was probably good. The preparation for the towing and the towing were difficult and at times dangerous. The statement of the matter in the brief of one group of claimants, beginning when the fire was extinguished, is substantially correct.[5]

Patrick J. Moore, Johan M. Evensen, Thomas R. Smith, Thomas J. Chambers, Stephen C. Donovan, Joseph A. R. Caron, Henry Weckesser, Edward J. Walsh, Joseph S. Lockard, Leo P. Elb, Harry M. Glock, Fred G. Palmer, Joseph W. Kuehner, Louis W. Dembeck, Joseph B. Badagliacco, Raphael Cruz, John A. Chamberlin, Edward G. Jones, Pedro E. Santos, James Murphy, Marvin C. Spencer, Walter J. Grau, Manuel R. Valentin, J. F. Campbell, and John Henry.

4. The names of the officers and crew of the Esso Burlington who have filed claims are as follows:

Walter F. Andrews, Harold F. Blytt, John H. Brown, III, Joseph R. H. Gauthier, George A. Proctor, Robert A. Stewart, Herbert F. Hewitt, John P. Dearman, Alben W. Trainer, Norman F. Washburn, Robert V. Brennan, Avelino B. Correia, Manuel J. Roderick, Hans C. K. Petersen, John J. Stupi, Thaddeus S. Skedinski, James A. Culledge, Harry S. Lygren, Charles W. McClelland, Warner E. St. Clair, Herbert R. Lynn, Erling L. Nilsen, Wandell S. Kelley, Clem Frizzle, Lewis D. Nelson, Stanley J. Ornowski, John A. Felt, Joe E. Peterson, Joseph R. Geff, Pat. J. McNerney, James K. Lockwood, Jr., Ralph J. Beilman, Joas J.

Gilmete, Maurice LeBrescu, Lawrence J. Lamontagne, Orion H. Hicks, Stanley Manchur, and Vance V. Ware.

5. Such statement is as follows:

"The Virginia then had lines run from its stern to the bow of the Greensboro and made about four lines fast to it. These lines were insufficient for towing purposes so they attempted to free the anchor chain in order to use the anchor chain as a tow line. To do so, they had to cut away the anchor itself, the anchor being on the most forward part of the Greensboro. An acetyline torch was sent over from the Virginia to the Greensboro and with all possible precaution taken, the anchor was cut away. The use of an acetyline torch, in itself a dangerous undertaking because of the sparks that might ignite, (since at that time there were still heavy fumes prevailing on the ship) was nevertheless a risk that had to be taken and the cutting away of the anchor was successfully accomplished. After the anchor had been cut away the Chief Mate and his crew attempted to get the anchor chain pulled out of the hawse pipe but found that the wildcat apparently was frozen, i. e., the extreme heat had molten the steel together and the chain would not

The towing time was not prolonged by any action of the officers and crew of the S.S. Virginia.

pull out. The Master then sent over four more hawsers and had them made fast to the Greensboro's bow. Some hours later the Master received a message from the Gulf area manager of the National Bulk Carriers, Inc. (Owners of the Virginia) congratulating him on the excellent job of putting out the fires, saving the Greensboro and taking her in tow, and instructing him to bring her into Galveston. The Master then instructed the cooks on the Virginia to get together food for five men for five days and called the Chief Mate to bring his men back to the Virginia. The Chief Mate and his men came back to the Virginia. The Chief gave a full and complete report to the Master of the conditions as he found them aboard the Greensboro and then the Chief Mate Martin O. Bowin, Jr., accompanied by the boatswain Herman F. Rossmaier, Cleve Edwards, Jr., Deck Maintenance/Ordinary Seaman, Henry L. Wells, wiper and Coy H. Helton, Messman. These unlicensed members of the crew, with the Chief Mate, remained on the Greensboro until April 23rd, with the exception of the Chief Mate who remained with the vessel until May 3rd. After the Chief and the other four members of the crew returned to the Greensboro, the life boat went back to the Virginia and raised to the Virginia's rail so that it would be immediately available in the event of explosion on board the Greensboro. The Virginia thereafter, together with her tow the Greensboro, got under way shortly after 5:00 A.M. The Master continued to supervise the navigation of the Virginia, as well as the Greensboro. The Greensboro was towing very poorly and yawing from side to side. At 7:30 A.M. the Greensboro swung very hard to the left and the four Manila hawsers broke. The Master again maneuvered the Virginia into position on the Greenboro's bow and the Chief Mate on the Greensboro called over that he had been working on the wildcat and drum of the windlass, and he thought it might be possible to get the anchor chain out now and use it as a tow line. The Master caused a Manila line, by means of a heaving line, to be sent over to the Greensboro, and the Manila line was made fast to the starboard chain of the Greensboro. The Manila line was heaved in by the after windlass of the Virginia and the chain started to run out, the brake of the

(h) Petitioner says in its brief:
*"The apparent lack of good faith on the part of the salvors is a fac-*

Greensboro's windlass however, would not hold and the whole length of the anchor chain ran out before they could get all the Manila line aboard the Virginia. As a result of which the anchor chain of the Greensboro did not reach directly on to the Virginia but was tied to the stern of the Virginia by means of an 8″ hawser (See Claimants' Exhibit No. 24). The condition of the anchor chain as shown in Claimants' Exhibit No. 24 was such it could not be used as a true tow line, and, therefore, another Manila line was sent over to the Virginia, and the Greensboro's insurance cable was passed from the Greensboro's bow to the Virginia's stern. At 1:50 P. M. on April 21st, they got under way again and the weight of the anchor chain acted in some manner as a spring helping the insurance wire in the towing operation. The Chief Mate had by this time tried to get the emergency steering system working but by reason of the intense heat it had been frozen too so that it could not be used. In the meantime, the Master noted that because of the mast of the Greensboro trailing in the water on the starboard side the Greensboro had a tendency to run to the starboard. In order to utilize this, the Master turned the Virginia to the starboard also keeping a little weight on the tow line so the Greensboro was towing on the Virginia's starboard quarter. The Greensboro seemed to tow well like that but that required constant and continuous wheel watching. Gradually, and with unusual and highly skilled maneuvering, both ships were worked back on the course to Galveston a couple of degrees at a time. On the morning of April 22nd around 7:30 A.M., they got under way again; the Master was standing on the stern directing the Third Mate on the bridge. This maneuvering was made doubly hazardous after the anchor chain was added because there was constant danger that the anchor chain would get fouled with the wheel or rudder.

"The Greensboro towed well on the Virginia's starboard quarter all the rest of the 21st and 22nd, but around the 23rd, the wind shifted and increased in force causing the Greensboro to yaw again. Around 4:00 A.M. of the 23rd, the anchor chain began dragging on the bottom and at 8:10 A.M. it had worn through the Manila line which made it fast to the Virginia's stern. It was impossible to tow the Greensboro with the chain on the

*tor to be considered by the Court and will cause a substantial diminu-* *tion in any award to be made for the services rendered."*

bottom so the Master directed the Chief Mate to slip the anchor chain, and let it go. The chain in falling fouled the insurance wire and the two vessels came closer together, there was again immediate danger of collision, and the Master had the insurance wire cut on the Virginia's stern, and then maneuvered the Virginia again alongside the Greensboro's bow but by this time the sea wind had increased and this made it more difficult to hold the Virginia in position. At 3:00 P.M. by means of Manila hawsers hove from the stern of the Virginia to the bow of the Greensboro, they got the Virginia's insurance wire aboard the Greensboro. By this method they got the Greensboro's second insurance wire aboard the Virginia about 4:00 P.M., however, they were unable to clear the former insurance wire on the Greensboro from the chain so that was slipped too. At about 4:00 P.M. on the 23rd, the Master caused a life boat to be launched to change crews on the Greensboro. By this time the Chief Mate and the four members of the crew left the Greensboro exhausted and returned to the Virginia for a much needed rest. In their place the relief group, in charge of Second Mate, Lewe F. Faust, boarded the Greensboro April 23rd together with Ordinary Seaman, Edward J. Kramer, A. B. Seaman, Johnnie Leonard Schwarzauer, First Assistant Engineer Paul R. Chase, Deck Maintenance William Francis Hutchins, and wiper, J. D. Williams. At 5:00 P.M., the life boat of the Virginia was returned and raised on the davits. The Master had run from the Virginia's stern a double length of 3" Manila line to facilitate the further passing of lines or material using this 3" line as an endless line, i. e., Messenger line; at 5:50 they got under way again with the Greensboro towed with two insurance wires and an 8" Manila. At 6:00 P.M. they had a Manila line slipped on the Greensboro and heaved this on to the Virginia. In the afternoon of April 23, 1951, the Master of the Virginia received a wire from the salvage tug Cable stating that they had orders to take over the Greensboro, and asking for their position. The cable message from the tug did not say by whose authority they were acting (See Claimant's Ex.No. ) and the radiogram was signed only 'Salvage Officer.' The Master replied to the salvage officer to 'Stand By' and he would give him an answer. In the meantime he contacted Mr. Boddin of the National Bulk Carriers, owners of the vessel, by ship to shore telephone, and asked him what to do. Mr. Boddin answered that he had no knowledge who sent the tug Cable and instructed him not to surrender the tow. In the afternoon of April 23, 1951, Mr. Boddin radioed the Master advising him to grant permission to the morticians and some officers and attorneys for the Esso Shipping Company to remove the bodies from the Greensboro. Arrangements were immediately made in order to accomplish this result. On the 24th day of April, 1951, the tug Bisso came by with Messrs. A. C. Steinmuller, Guy Bennett, Frank B. Cox, R. T. Greene, A. C. Thompson, F. Newton and Charles Kirkindall representing the Esso Shipping Company, Mr. I. J. Boddin, representing National Bulk Carriers, together with Messrs. James B. Johnson, L. R. Weber, V. H. Bolton, W. H. Monroe, Wallace Groues, Richard J. Buss, H. C. Hinton, Sr., Morticians, to pick up the bodies, and boarded the Virginia, and thereafter, accompanied by Chief Mate Bowin, boarded the Greensboro. On the Greensboro, the morticians with the aid of the First Assistant Engineer Paul R. Chase, placed the bodies on stretchers, and those who were burned so that their bodies were in pieces were placed in containers and taken ashore. After the bodies were removed the Second Mate, Mr. Faust, returned to the Virginia and the Chief Mate took his position back on the Greensboro where he remained, navigating her and doing all the necessary work aboard, together with the five men hereinabove mentioned, until the vessel reached Galveston. After the bodies were removed from the Greensboro at 4:30 P.M. of April 24, the tug Bisso with the personnel representing the Esso Shipping Company, their attorney, Mr. Greene, the morticians and the burned bodies left for Galveston.

"At 6:45 P.M. that evening one insurance wire to the Greensboro parted, but they continued in tow with one remaining wire as all the members of the crew were too tired and exhausted to get more lines out at that time. They continued at reduced speed until 2:15 P.M. on April 25, 1951, when the tug Wamsley came alongside to assist the Virginia, and at 11:00 P.M. of the same date the tug Albatross came alongside also. The towing of the Greensboro was continued throughout the night until the morning at 6:30 P.M. on April 26th when the tug Albatross left and proceeded into Galveston. The Virginia with the Greensboro in tow were

The evidence does not support this view. I find that neither the officers nor the crew of the S.S. Virginia were guilty of bad faith, but that they acted throughout in good faith.

(i) Petitioner says in its brief:

*"The Esso Greensboro was not a derelict."*

I find that at the time the officers and crew of the S.S. Virginia first sighted the Esso Greensboro, about 7:30 P.M., April 20, 1951, the Esso Greensboro had been abandoned by petitioner and her owner, and was and continued to be a derelict.

(j) There was no previous relation, contract or otherwise, between the S.S. Virginia or her owners, officers, and crew, and the Esso Greensboro, her owners, officers, and crew. The officers and members of the crew of the S.S. Virginia were volunteer salvors in undertaking to extinguish the fire on the Esso Greensboro, to save any survivors, and

then at the entrance of Galveston Harbor and because of heavy fog the vessels had to be anchored. The Master headed the Virginia and tow into the current and slowed down a few revolutions, and at that time cautioned the Wamsley to work astern on its engines and thus slow the Greensboro down. He instructed one of these men to go on the foredeck of the Virginia as far forward as possible, dropping a lead line on the bottom of the break of the main deck. He was cautioned to walk back aft holding the lead on the bottom as the Virginia's movement through the water brought this more astern. This procedure was repeated until the Master was certain that the Virginia was being floated astern by the current and the Greensboro was still astern and not running upon the Virginia. During this time the Second Mate Faust lowered the anchor to bottom, the anchor caught and took a good strain, and as the Greensboro was not walking up on the Virginia enough chain was lowered away to hold both vessels.

"The fog continued heavy until about 3:20 A.M. on April 27, 1951, and the vessels remained at anchor by giving the prescribed signals. At 3:50 A.M., the Master ordered to heave anchor and get away to enter the Harbor but heavy fogs set in again, so it was necessary to head out into the current and anchor using the same procedure, as hereinabove described. The anchor was walked out the second time at 6:35 A.M., and the vessel was secured at anchor at 7:05. It again began to clear up and around 9:00 A.M. as required by the regulations of the Galveston Harbor, the Pilot was called and after the Pilot boarded the vessel the anchors were aweigh. Thereafter, the Master caused four 8" manila lines to be run over to the Greensboro by means of 3" Manila endless, or messenger, lines. This was to be used as insurance against the possibility of the one cable breaking while going over the Bar. He instruct-

ed the crew that in the event the cable should break they were to immediately slack off these four Manila lines until they could bring the Greensboro under control without breaking these lines. Then he went back and assumed his position on the bridge. They proceeded into the Harbor with four tugs assisting. While crossing the Bar the current caught the Virginia and swung it toward the breakwater. This made the tow line slack. As the Master feared that this might foul the wheel of the Virginia he increased the speed. The increased speed of the Virginia brought it out of the sheer, but then the Greensboro was caught in the current and made it sheer toward the breakwater. This tightened the tow line and before the Master could stop the Virginia's speed the cable tow line broke. The man on the stern did as they were instructed to do and immediately slackened away on the Manila hawsers thereby checking the swing of the Greenboro bringing the ships in line once more. The vessel then proceeded into Bolivar Roads, dropping the port anchor of the Greensboro at 2:20 on April 27, 1951. At 3:00 the four Manila lines on the Greensboro were set free and hove into the Virginia's stern. The Virginia then picked up anchor and proceeded to bunkering berth leaving the Chief Mate with the First Assistant Engineer and four crew members aboard the Greensboro. The United States Coast Guard boarded the Virginia when she arrived at the bunkering berth, and thereafter the Master and the officers and members of the crew gave their testimony concerning their activities regarding their efforts in salving the Esso Greensboro. At 12:38 A.M. on April 28th, the Virginia left the loading berth in Galveston for Corpus Christi, thus concluding its salvage operations, starting from shortly before 8:00 P.M. on April 20th and continuing until the evening of April 28th, 1951."

to recover the bodies of the dead, and bring the Esso Greensboro and her cargo into a safe port. Their undertaking terminated in success.

(k) The value of the property saved has been stipulated to be $1,000,000.[6]

(1) There are other stipulations. No good purpose would be served by copying them here, but they are adopted and referred to and may be quoted, wholly or in part, here.

(m) Neither the officers nor the crew of the Esso New York did anything in the matter of extinguishing the fire on the Esso Greensboro nor in salvaging the Esso Greensboro. They did rescue four members of the crew and recovered the bodies of two members of the crew of the Esso Greensboro.[7]

(n) Neither the officers nor the crew of the Esso Burlington did anything in the matter of extinguishing the fire on the Esso Greensboro nor in salvaging the Esso Greensboro. They did, however, rescue one person and recover the body of one person who were members of the crew of the Esso Greensboro.[8]

■ 1: The question of whether the Esso Greensboro had been abandoned by petitioner and was a derelict is one of fact. Belcher Oil Co. v. Griffin, 5 Cir., 97 F.2d 425. The finding is that it had been abandoned and was a derelict.[9] But petitioner says that under the facts here, it should be held, as a matter of law, that the Esso Greensboro had not been abandoned and that she was not a derelict.

■ While it is true that where a vessel is found deserted or abandoned at sea in a situation of peril, with no living person aboard her, she will be regarded as prima facie a derelict, I think the intention of her owners would have weight and should be inquired into.

Petitioner apparently contends that the intention of the petitioner with respect to the abandonment of the Esso Greensboro may be determined, or largely determined, by the action of the Esso New York and Esso Burlington, owned by petitioner. The Esso New York arrived near the Esso Greensboro about 10:00 A. M., April 20, 1951. After res-

6. Such Stipulation is as follows:
"It is hereby stipulated, consented to and agreed by the undersigned, Proctors for the parties hereto, that for purposes of the salvage trial herein, the salved value of the SS Esso Greensboro, her cargo, bunkers, etc. is $1,000,000.00

"It is further understood that this stipulation is solely for purposes of the salvage trial now pending, and is not to be considered an admission by the owners as to actual value for any other purpose."

7. In the brief of the officers and crew of the Esso New York, it is said:
"All that we can say at this time is that both from our viewpoint at the times in question and from the viewpoint of hindsight, we submit that the duty of the Esso New York was quite clear and that the actions of her officers and crew at all times were exemplary. Our sole claim in this pending case is for a share of whatever award the Court may decree to the officers and crew of the Virginia. Although we played no part in the actual salvaging of the hull of the Esso Greensboro, we do feel that for our services in rescuing four of her crew

members and in further recovering the body of two deceased crew members we are entitled to a substantial share in said salvage award."

8. In the brief of the officers and crew of the Esso Burlington, it is said:
"We do not understand the niceties of the law and are not sure whether or not under the circumstances the officers and crew of the Virginia are entitled to a salvage award. We do submit, however, that if they do receive an award from this Court that the officers and crew of the Esso Burlington, as salvors of life, are entitled to a substantial share.

"It must be recalled that not only were we successful in rescuing McMahon and the recovery of the body of Wajda, but that by maintaining our vigil during the night of April 20–21 in the position where these men were seen we enabled the Coast Guard to come in on the morning of April 21st to the exact scene of the disaster and to take up the search from there, which search was successful to the extent that one further body was recovered by the Coast Guard."

9. See Finding of Fact (i).

cuing some survivors, she, on information received, assumed that there were no survivors on the Esso Greensboro and left the vicinity of the Esso Greensboro. She selected as her task and devoted her entire attention to the Esso Suez.

The Esso Burlington, when she arrived on the scene about 3:00 P. M., April 20, 1951, rescued one survivor and recovered one body, and also assuming, from information received, that there were no other survivors on board the Esso Greensboro, selected as her task the rescue of other survivors and the recovery of bodies in the water. There is no criticism of this action of the two vessels, but it shows that the officers and crew of neither vessel had any plan or intention of doing what was necessary and essential to be done, and what the officers and crew of the S.S. Virginia did, i. e., go on board the Esso Greensboro, ascertain whether there was anyone alive thereon, extinguish the fire, recover the dead bodies, and tow the ship into harbor. The part the Esso New York and Esso Burlington took is substantially correctly stated in the quotation in the margin from petitioner's brief.[10] I quote also in the margin a fairly accurate statement in the brief of one group of claimants of the movements of the Esso New York.[11] Also I quote in the margin from the same brief a

10. Petitioner says in its brief:

"The first vessel to arrive at the scene of the Esso Suez-Esso Greensboro disaster was the Esso New York, which vessel first assisted in taking the four survivors of the crew of the Esso Greensboro from the burning tanker and thereafter concentrated her efforts in administering to the needs of the Esso Suez. While engaged with the latter, the Esso Burlington arrived on the scene and immediately assumed the task of searching for further possible survivors in the waters adjacent to the burning Esso Greensboro. The record establishes the fact that the Esso Burlington was successful in rescuing one survivor and in recovering one body. The testimony of Captain Andrews of the Esso Burlington further establishes the fact that there were more bodies in the vicinity of the Esso Greensboro and possibly more survivors. The Esso Burlington remained in the area of the Esso Greensboro concentrating on the task of recovering survivors and/or bodies in the surrounding waters," etc.

11. Such claimants say in their brief:

"At that time the Master of the New York caused his vessel to be steered to the vicinity of the burning vessel, and at about 10:00 A.M. approached it thinking it was the Suez. At 1555 GNT (9:55 Central Standard time) the New York sent the following message to its owner, Stanship— New York, reading as follows:

"'Esso New York arrived alongside Esso Suez

Vessel burning more information later.

Advise orders requested /s/ Kooistra.'

(The vessel burning alongside later proved to be the Esso Greensboro.)

"Immediately upon arriving at the scene the New York caused its Chief Mate W. Tolfsby (now Captain of the New York) and approximately eight others to be launched in a life boat and picked up four survivors and two bodies. It was not until after the New York picked up the four survivors and the two bodies that it notified the Petitioner and the Coast Guard of its activities. Prior to that time the New York did not communicate with nor appraise them of their activities. At 11:17, the District Commander, Eighth Coast Guard District, radioed to the New York, as follows:

"'District Commander Eighth Coast Guard District recommends you stay at scene of Greensboro to look for survivors and see if any life boats from Greensboro are missing from davit. Probably one or two life boats from Greensboro on water near scene but unsighted. Believe Esso Suez not in need of immediate assistance except medical. Want to concentrate efforts on Greensboro for possible survivors.' (Pet.Ex.No. 9, Radiolog 'New York', page 13, Line 11.)

"Notwithstanding, such recommendation from the Coast Guard, the New York proceeded to the aid of the Suez, some eighteen miles away from the burning Greensboro, as directed by Petitioner 'Stanship'. At 2:30 P.M. the New York advised the Burlington to go to the scene and stand by the burning vessel Greensboro and to keep in communication with 'Stanship' while she, the New York, would escort the Suez to whatever destination 'Stanship' might order her to. Thereafter, the New York transferred some of the survivors to the Suez and others to a Navy Plane which took them off for treatment. This, in short, is the

fairly accurate statement of the movements of the Esso Burlington.[12]

 I think the facts here show as a matter of Law that the Esso Greensboro had been abandoned and that she was a derelict. The mere fact that petitioner may have had a vague intention to obtain assistance for the vessel, or a mere general hope or a mere general intention to ultimately rescue her, is not sufficient to prevent her from being regarded as a derelict. There must have been a reasonable expectation, prospect and hope of petitioner boarding the Esso Greensboro, extinguishing the fire, and towing her to port, etc. There was not. Consideration of the cases which petitioner cites does not change this view.[13]

Petitioner claims that the Esso New York and Esso Burlington had constructive possession of the Esso Greensboro.[14] I do not think so.

activity engaged in by the officers and members of the crew of the New York in the rescuing of the members of the Greensboro crew. Captain Kooistra and the officers and crew of the New York engaged in life salvage operation of the highest order of merit in rescuing these four crew members of the Greensboro. Nothing said by any of the Claimants is sought in any manner to detract from the competent actions of the officers and crew of the New York or Burlington, or in any manner impair the liberal award they are entitled to by reason of such salvage operations."

12. Such claimants say in their brief:
"The Esso Burlington, a vessel owned by Petitioner, was en route from Philadelphia to Baytown in ballast. In the morning of April 20th, she was in the Gulf of Mexico, approximately ninety some miles away from the scene where the Greensboro and the Suez collided, proceeding toward her destination. She received no message until sometime around 8:32 A.M. reading as follows:
" 'Esso Suez on fire 2618 N.long.9127 West. May use you for towing job stand in position. (Petitioner's Ex. 13, 'Stanship' Burlington Radiolog, Page 1, Line 10.)
"The Burlington replied to 'Stanship' Houston at 8:40 giving its position as 2735 N.9017 W. The Burlington continued on its course while waiting for a reply. Shortly thereafter at 8:43 she received a message from the Suez stating that she did not need immediate help, so they continued on their course. As Captain Andrews testified:
"A. 'S.S.Esso Burlington, WMU Esso Suez in distress. Latitude 2618 North Longitude 9127 West. Suggest you proceed and assist all possible. Signed Stanship.'
"Q. (By Mr. Greene) After receiving that, what did you do? A. I immediately changed course and proceeded to the scene.

"Q. When did you arrive on the scene? A. About 1500 on the 20th. That's the local time.
"At 9:08 she had received the message from 'Stanship' reading as follows:
" 'SS Esso Burlington, WMU, Esso Suez in distress, latitude 2618 North Longitude 9127 West. Suggest you proceed and assist all possible. /s/ 'Stanship'
"It was only after receiving that message that the Burlington, a sister ship of the Greensboro, changed its course in accordance with the instructions received from Petitioner, to proceed to the scene. In accordance with such orders she arrived in the vicinity of the Greensboro shortly after 3:00 P.M.
"At 5:25 P.M. with the aid of a Coast Guard Plane she found the survivor Michael Wajda and rescued him. In Captain Andrews' search to find more survivors he located two charred bodies in the water but was unable to pick them up because of darkness. Thereafter the Captain of the Burlington hove to what he says was approximately six miles from the Greensboro to await the morning light. Therefore, the extent of the activities of the Master, Officers and members of the crew of the Burlington in the salvage operations of the Greensboro consisted of the rescue of one member of the Greensboro crew."

13. The No. 105, (Belcher Oil Co. v. Griffin) 5 Cir., 97 F.2d 425. Lloyd Cuarto, D.C., 84 F.Supp. 33, 1949 A.M.C. 1016.

14. Petitioner says:
"On these facts we submit that the Esso Greensboro was at all times throughout the day of April 20th in the constructive possession of her owners through the ministry of either the Esso New York or the Esso Burlington. There is not the slightest indication that the owners of the Esso Greensboro intended to abandon the vessel and, on the contrary, a clear indication that after lifesaving operations had been completed by the Esso Burlington, that that vessel would tend

2: The facts clearly show that those claimants who are officers and crew of the S.S. Virginia are entitled to recover salvage. The statement of the facts in the brief of one group of salvage claimants as to the activities of the officers and crew of the S.S. Virginia beginning about 7:30 P. M., April 20, 1951, is substantially correct.[15]

▓ A non-contractual salvage service is one which is voluntarily ren-

to the needs of the burning tanker to extinguish any remaining fires and eventually take the vessel in tow to a port of refuge."

15. Such statement is as follows:

"Sometime later, about 7:50 P.M., the loom of the burning Greensboro was sighted on the port bow of the Virginia. The wind was from South East force 4 so the Master altered the course to pass to the windward of the burning Greenboro. He judged that the wind had probably blown the oilslick to the leeward of the Greensboro, and in the event this should ignite he, of course, had to keep his vessel out of the fire. At this time, all of the crew except those who were assigned to duty in the engine room were mustered on deck. Everyone on deck looked out for survivors. As they circled the Greensboro this lookout was continued with floodlights and glasses, but no survivors were visible in the water. While circling the Greensboro the Master and officers of the Virginia sighted some lights on another vessel (believed in retrospect to have been the Burlington) but after awhile the lights disappeared in the horizon and were not see again. While they circled the burning Greensboro, she was still aflame with extremely high flames leaping up into the air and burning from stem to stern. By that time the Virginia was navigated into a position where the stern of the Virginia was to the starboard side of the bow of the Greensboro. The Virginia turned around once more and came back passing the Greensboro close but still could not see any signs of life on her. The fracture of the hull immediately after of the midship housing around the No.8 Tank (See Claimants' Ex.No.2) appeared as a gaping hole which proved later to be sixty (60) feet deep. The tanks on the forward deck, as well as on the after deck, were ablaze, shooting up flames, the quarters were also afire and the flames could be seen through the port holes. The mast had been knocked down and was hanging over the starboard side of the ship. Upon discussing the possibility of boarding the vessel, the Captain, Chief Mate and the Chief Engineer were convinced that if there were any survivors aboard the Greensboro they would either be trapped by the fire in the quarters or else badly burned and in need of immediate medical attention. Instructions were given to the Chief Mate and the men under him that if they boarded the Greensboro and were able to make any search of the vessel, if at all possible, to be sure to leave everything intact, that it would not interfere with the search for survivors, so that the Coast Guard when investigating could look at the physical situation exactly as it was in order to aid in determining the cause of the disaster or any other facts.

"After full consultation the Master delegated his Chief Officer Mr. Martin Bowin who with fourteen (14) volunteers, members of the crew, launched a life boat and searched the water for survivors, passing on to the starboard side and immediately aft of the forecastle head of the Greensboro. The Chief Mate first boarded the Greensboro, looked over the situation, and then called some of the crew in the life boat with him. Some members of the boarding party remained in the life boat and the others, together with the Chief Mate, boarded the vessel. A survey was made on the forecastle head and fire and hot steam was found to be immediately underneath the forecastle head, the decks were so hot from the burning fire that no one could remain standing for any length of time in any one place or position. After a quick survey was made, the Chief Officer with other members of the crew attempted to reach the midship housing in order to determine whether there were any survivors there. This was attempted by leaving the forecastle head and getting on to the catwalk which ran fore and after in the center of the vessel in order to reach the midship housing. The tanks on either side of the midship housing were burning, shooting up flames and the flames were licking at the catwalk. The heat was so intense that they could not reach sufficiently into the midship housing to discover whether there were any survivors, so they returned and then by way of megaphone discussed the problem with the Master of the Virginia. The Captain then maneuvered the Virginia until she was on the lee side of the Greensboro, it being his intention to back in rather than come in bow first as these vessels always ma-

dered. The service here was voluntarily rendered. It must be effective and beneficial. It is undisputed that the service by the officers and crew of the S.S. Virginia was effective and beneficial. The salvage service may be either a "low

neuver better on a head bell. He lined the Virginia stern up pointing at the SS Greensboro's stern at about a 45 deg. angle to the Greensboro's plane. He then started backing the stern of the Virginia swinging toward the bow of the Greensboro as expected. By that time the life boat crew got aboard the Greensboro and the Master could see flashlights searching the midship quarters. He finally maneuvered the Virginia into position on the Greensboro's starboard bow at right angles to the Greensboro, and stopped in the water. He went back to the stern of the Virginia leaving the Third Mate in charge of the bridge to transmit his orders to the wheelman in the engine room. At the time these operations were completed the Chief Mate called and advised that he had managed to reach the midship quarters and found neither survivors nor bodies, he further advised him that in order to make a good search it would be necessary to attempt to put the fires out, and he thought an attempt should be made to put them out though there would be some serious risks and danger involved. Upon discussing the matter with him, it was decided that an attempt be made to extinguish the fires. The master therefore called the lifeboat back to the Virginia and passed a Manila hawser, which they took back to the Greensboro and made it fast to the bow. The crew of the Virginia then took this hawser to the after winch and heaved it tight. The men on the stern of the Virginia were under the supervision of the Second Mate while the Master stationed himself on top of the wooden sunshade of the Poop Deck to be within easy distance of the telephone. By means of the line to the after windlass the Virginia was pulled close to the Greensboro's bow, while the Master kept the Virginia at right angles, or nearly so, to the Greensboro by means of coming very slowly in on the engines with the wheel hard right or left at short periods of time. The life boat was again recalled to the Virginia and by means of messenger lines made fast to the Greensboro as well as to the Virginia, thus it was possible to haul the life boat back and forth from the Virginia to the Greensboro without having too many men row back and forth, allowing the greatest number of men to get aboard the Greensboro and put out the fires. Thereafter the hoses in the life boat were connected to hoses on the Virginia's stern and put over to the Greensboro. The hoses of the stern of the Virginia were played out into the water. The hoses from the life boat were passed up to the men on the SS Greensboro and water pressure was then applied by the Virginia's pumps. The life boat was moved out midway between the Greensboro and the Virginia to take some of the weight of the hoses filled with water. The Chief Mate and his men then directed the stream from the hose to each tank top. As the water hit the burning tank top a great deal of steam immediately formed which smothered out the fire. The men were kept away from the burned out fire because as the steam evaporated oxygen immediately penetrated the tanks which were then filled with West Texas oil, a highly combustible mineral and with so many flames surrounding it, there was constant danger of further serious explosion. Thus, the water was played on each tank top and the fires were finally extinguished on the forward deck to the midship housing. Thereafter, the fire in the midship housing was put out and the smoke and steam were cleansed and removed and thorough search made of the midship housing.

"By that time the hose lines broke and another maneuver was necessary in order to repair them, and then after much effort the fires in the after portion of the vessel were finally put out. There was a great deal of difficulty to reach the back, aft of the vessel, because immediately after the midship housing the fracture which was approximately forty-five (45) feet at its widest part and approximately one (1') foot at its narrowest were separating the forward part from the after end of the ship. The only way to reach the aft part was to crawl over the debris, broken mast, twisted steel plates, and lines, staves, etc. Water was then played on the after tank top area, but the length of the hose together with the water proved to be too much weight, and the hose burst before the fire could be extinguished. The ends of the hose were then pulled back to the Virginia from the Greensboro, the life boat pulled back to the Virginia, new hoses connected to the broken end and the life boat sent back to the Greensboro. The new hoses from the life boat were passed up to the men on the Greensboro and this time the hoses were under the Virginia's stern to the Greensboro's bow and then run

order" or a "high order", etc. Here it was "high order". The character of the salvage service is to be considered in the light of conditions existing at the time of performance. The evidence fully shows such conditions and fully sustains the conclusion that the officers and crew of the S.S. Virginia are entitled to recover salvage.[16]

3: Petitioner charges the officers and crew of the SS "Virginia" with bad faith. I do not think nor find that there was bad faith or lack of good faith on the part of the officers and crew of the SS "Virginia."[17] Their purpose first of all was to rescue any person who might still be alive on the Esso Greensboro, to recover the bodies of the dead

down to the fore deck of the Greensboro over the amidship deck, and then to the forward part of the fractured ship's hull. Water pressure was again applied and the steam directed to the burning after tank top. The decks had apparently cooled some from the water sprayed on the fire prior to the hose breaking and because of lack of sufficient steam this fire took longer to put out. It eventually was extinguished, the life boats were recalled to the Virginia, and fire extinguishers from the Virginia were sent over to the Chief Mate's crew. It was extremely dangerous to go into the after part of the quarters with hoses as the Greensboro was an electric job and neither the Master nor the Chief knew what they would run into in the engine room. The quarters were therefore entered with fire extinguishers. The Chief Mate then reported that he could find no survivors but there were ten or twelve bodies (It was later established there were fifteen bodies on the Greensboro.) In this operation the unlicensed members of the crew under the direction of the Chief Mate were putting out the smoldering rags, ropes and other burning material on the shelter deck and under the forecastle head. The fire extinguishers had by this time been emptied so that the men were lowering buckets over the side and by means of this bucket brigade, water was obtained to put out the fire throughout the vessel. The Chief mate opened up the domestic tank in the shelter deck and dropped the water into the tanks. This finally extinguished all the fires on the shelter deck. Immediately after the fires on the deck were extinguished and the stress of immediate danger somewhat averted—in the early morning of April 21st—the Coast Guard and the owners of the Virginia, National Bulk Carriers, Inc., were immediately notified. However, all of the fires, including the fires in the shelter deck, the after housing, etc. were not extinguished until approximately 5:00 A.M."

16. The Blaireau, 2 Cranch. 240, 6 U.S. 240, 2 L.Ed. 266; The Blackwall, 10 Wall.

1, 77 U.S. 1, 19 L.Ed. 870; The Laura, 14 Wall. 336, 81 U.S. 336, 20 L.Ed. 813; The Sabine, 101 U.S. 384, 25 L.Ed. 982; Cope v. Vallette Dry Dock Co., 119 U. S. 625, 7 S.Ct. 336, 30 L.Ed. 501; The Jefferson, 215 U.S. 130, 30 S.Ct. 54, 54 L.Ed. 125; The Hyderabad, 7 Cir., 11 F. 749; Hamburg-American Line v. U. S., 1 Cir., 1948 (The Odenwald), 168 F.2d 47; The Antilla, 4 Cir., 245 F. 973; The Delmira, 5 Cir., 283 F. 441; The Thorvald Halvorsen, 2 Cir., 281 F. 506; The Shreveport, 4 Cir., 142 F.2d 524; The Fairisle, D.C., 76 F.Supp. 27, affirmed, Waterman S. S. Corp. v. Dean, 4 Cir., 171 F.2d 408; Baretich v. United States (The Saint Mihiel), D.C., 97 F.Supp. 600; The Centurion, 5 Fed.Cas., page 369, No. 2,554; The John Gilpen, 13 Fed. Cas., page 675, No. 7,345; The Black Sea, 1929 A.M.C. 138.

17. The brief of one group of claimants contains a substantially correct statement of what occurred on the S.S. "Virginia" before she arrived near the "Esso Greensboro":

"On the morning of April 20, 1951, the SS Virginia, in charge of its Master, Leonard Dockrill, was in the Gulf of Mexico en route from Marcus Hook, Pennsylvania to Aransas Pass, Texas. She was in ballast. At about 8:30 A.M., the Radio Operator informed the Master that he had received a radiogram reading as follows:

" 'All ships gulf of Mexico SS Esso Suez in collision with Esso Greensboro 2636 N.9146 West. Greensboro afire and abandoned. Esso Suez does not request additional assistance. All ships vicinity requested keep lookout for survivors Greensboro.'

"The same message was picked up by the radio of the New York and Burlington. At that time he placed this position on his chart and saw that he was approximately one hundred eighty (180) miles away from the scene and that his course of 283 Deg. would take him a few miles to the North of this position. Therefore, he continued in his course. During the day the ship's radio picked up a number

thereon, and to extinguish the fire thereon and save property.[18] As I listened to the testimony and particularly to the testimony of Chief Officer Bowin, giving his experience and that of the 14 men with him who first boarded the Esso Greensboro, I became convinced and am still convinced that none of the claimants who were on the S.S. Virginia were of the type depicted in petitioner's brief.[19]

A study of the authorities cited by petitioner[20] convinces one that the facts in each case must be looked to in deciding as to good faith. I think there is no bad faith here.

4: Petitioner also charges that the S.S. Virginia improperly refused the assistance of a salvage tug, resulting in a substantial prolongation of the towage time. The wording of this complaint will be found in the margin.[21] I have heretofore found the facts to be to the contrary.

Discussing now the legal effect of the refusal of assistance. It will be observed that the officers and crew of the S.S. Virginia put out the fire on the Esso Greensboro on the night of April 21st, completing the work early in the morning of April 22nd. A number of hours later, representatives of Petitioner proposed to "take over" the Esso Greensboro. The authorities cited by petitioner[22] are unconvincing that under these facts the officers and crew of the S.S. Virginia were required to surrender

---

of messages dealing with the collision and the disaster that befell those two ships.

"During the evening the Radio Operator brought in a message that came from the M/V Excello stating that it had passed the burning tanker, that it was down by the head, burning from forward to aft, but no survivors had been sighted."

18. See facts stated in Note 15.

19. Petitioner at one place in its brief uses this language. Speaking of the S.S. "Virginia", it says:

"Instead she played the hand of the lone wolf. She kept her presence known only to herself as she closed on the scene of the disaster. It is not pleasant for us to criticize and possibly condemn some of the officers of the Virginia, who apparently were being driven forward by the lust for salvage with complete disregard and abandon of the possible survivors that they could have so ably assisted if they had correlated their efforts with those of the Esso Burlington. However, judge we must for the record is very condemning. The actions of these officers do not sustain what they now tell us were their intentions at the time. Their actions show that they violated every precept of decency and comradeship known to the seaman. They approached the Esso Greensboro on the evening of April 20th knowing that at that very moment the sister ship of the Esso Greensboro was standing by about five or six miles away," etc.

20. The Island City, 1 Black 121, 17 L.Ed. 70; The Ragnarok, 2 Cir., 158 F. 694; Rodriguez v. Bagalini, 9 Cir., 17 F.2d 921; The Emulous, 8 Fed.Cas., page No. 4,479; The Mohawk-Harford, 3 Cir., 207 F. 626, 1953 A.M.C. 1541–1577. The Lisbon, 1 Ir.R.Eq. 144, Adm. "The Law of Civil Salvage" by Lord Kennedy. "The Law Relating to Shipmasters and Seamen" by Joseph Kay.

21. Petitioner says:

"The Virginia arrived alongside the Esso Greensboro late on April 21st, a Thursday night. By the following Saturday the Merritt Chapman Tug Cable overtook the Virginia with the Esso Greensboro in tow and offered her assistance in the towing operation. Early Saturday morning the Virginia received a radio message from the Cable as follows:

" 'We have orders to intercept and take over tanker Greensboro from you x please advise your present position also general condition of tow if heavy list down by head or stern, etc.

" '(signed) Salvage Officer.'

(Exhibit 2-o in Zickl deposition.)

"The Virginia refused this assistance. However, the Cable still remained in the area of the two vessels and accompanied the Virginia in her passage towards Galveston."

22. The Mohawk-Harford, 3 Cir., 207 F. 626, 1953 A.M.C. 1541; The Cape Packet, 3 W.Rob. 122, 123; 6 N. of C. 565; The Perla, Swa. 230; The Magdalen, 31 L.J. Ad. 22, 5 L.T.N.S. 807; The Dygden, 1 N. of C. 115; The Martha, Swa. 489; The Barefoot, 14 Jur. 841; The Glory, 14 Jur. 676; The Charlotta, 2 Hagg. 361; The Berlin, 4 Ir.Jur. 11; The Elizabeth, 8 Ir.Jur. 340; The Dossitei, 10 Jur. 865; The Dantzic Packet, 3 Hagg. 383.

possession of the Esso Greensboro or that their right to salvage was affected thereby.

5: This brings us to the question of the amount of salvage which should be paid to the officers and crew of the S.S. Virginia who are claiming salvage. The cases cited by the parties[23] are helpful, but none of them clearly point the way in the case we have here of the officers and crew of the S.S. Virginia in mid-ocean boarding a burning vessel, searching for survivors thereon, extinguishing the fires, making changes and repairs necessary to make in order to tow her to port, and towing her to port. As stated, the value of the Esso Greensboro as salvaged was, according to agreement, $1,000,000.

▊ (a) I conclude that there should be what may be called a *basic award* to each unlicensed member of the crew of the S.S. Virginia who are Claimants herein, and an additional award to such members of the crew as were in great danger or performed difficult or dangerous service or tasks. Such basic awards are shown in the margin.[24]

(b) In *addition* to such *basic award*, an award of $5,000 is made to each of the 14 men who are claimants herein who first left the S.S. Virginia in a life-

23. Mason v. Blaireau, 2 Cranch. 240, 6 U. S. 240, 2 L.Ed. 266; The Blackwall, 10 Wall. 1, 77 U.S. 1, 19 L.Ed. 870; The Sabine, 101 U.S. 384, 25 L.Ed. 982; United States v. Cornell Steamboat Co., 202 U.S. 184, 26 S.Ct. 648, 50 L.Ed. 987; The Hyderabad, 7 Cir., 11 F. 749; The Lowther Castle, 3 Cir., 195 F. 604; The Kin Ora, 4 Cir., 252 F. 507; The Olockson, 5 Cir., 281 F. 690; The Aslaksen, 6 Cir., 281 F. 444; The Santa Rita, 5 Cir., 281 F. 760; The Emanuel Stavroudis, 4 Cir., 23 F.2d 214; The Shreveport, 4 Cir., 42 F.2d 524; The Wahkeena, 9 Cir., 56 F.2d 833; Huasteca Petroleum Co. v. 27,907 Bags of Coffee, 2 Cir., 60 F.2d 907, 1932 A.M.C. 1338; Steel Barge No. 105, 5 Cir., 97 F.2d 425, 1938 A.M.C. 957; Waterman Steamship Corp. v. Dean, 4 Cir., 171 F.2d 408; Kimes v. U. S. (The Thomas Masaryk), 2 Cir., 207 F.2d 60, 1953 A. M.C. 1335; Baretich v. United States (The Saint Mihiel), D.C., 97 F.Supp. 600; The John Gilpen, 13 Fed.Cas., at page 675, No. 7,345; The Black Sea, 1929 A.M.C. 138; Atlantic Refining Co. v. Merritt & Chapman D. & W. Co., The Herbert L. Pratt, 1923 A.M.C. 1121, affirmed, 3 Cir., 300 F. 901, 1924 A.M.C. 712; The Graf Waldersee, 1927 A.M.C. 853; The El Sol, 63 Ct.Cl. 324, 1927 A. M.C. 708; The Western Hope, 2 Cir., 287 F. 400, 1923 A.M.C. 82; The Buckhannon, 2 Cir., 284 F. 917, 1923 A.M.C. 168; The Katrina Luckenbach, 1926 A. M.C. 368; The Balto, 24 F. 147, 1928 A.M.C. 722. City of Berkeley, 1928 A. M.C. 1362; The Wampum, 1928 A.M.C. 1579; The West Quechee, 1932 A.M.C. 200; The Hanover, 1932 A.M.C. 200; The West Jester, 1932 A.M.C. 200; The West Kader, 1932 A.M.C. 200; The Hatteras, 1932 A.M.C. 201; The Scanyork,

1933 A.M.C. 1094; The Ansaldo San Giorgia Secondo, 2 Cir., 69 F.2d 521, 1933 A.M.C. 181, 1934 A.M.C. 360; The Eastern Glen (The Marie Maersk) D.C., 11 F.Supp. 995, 1935 A.M.C. 1117; The Donbass, D.C., 74 F.Supp. 15, 1947 A.M. C. 1559; The Abraham Baldwin, D.C., 75 F.Supp. 845, 1948 A.M.C. 500; The Ferdinand R. Hassler, 1949 A.M.C. 1911; The Cape Horn, 1949 A.M.C. 2033; The George R. Poole, 96 F.Supp. 335, 1951 A.M.C. 1137; C. Keith, 1951 A.M.C. 1906; The Florence Luckenbach, D.C., 9 F. Supp. 1008, 1926 A.M.C. 672; The Gulfking, 1930 A.M.C. 150; The Frej, 1948, A.M.C. 1576; The Hadley F. Brown, 1949 A.M.C. 1181; Lloyd Cuarto, 84 F. Supp. 33, 1949 A.M.C. 1016. See also cases hereinbefore cited.

24. Such *basic* awards to the Unlicensed Members of the Crew of the S.S. Virginia are as follows:

Jay (Dee) Williams $1,000; Walter L. Slodkowski $1,000; Herman F. Rossmaier $1,000; Sam Jordan $1,000; William F. Hutchins $1,000; Coy H. Helton $1,000; Otis W. Latson $1,000; Charles C. Crockett $1,000; Gabino Garcia $1,000; Manuel B. Alcalde $1,000; Benedicto S. Munar $1,000; Luke Luethy $1,000; Thomas S. Siciliano $1,000; Harry Milnes $1,000; Ralph Chappell $1,000; K. G. Hebner $1,000; Eddie Pietsch $1,000; Cleve Edwards, Jr. $1,000; Henry N. Wells $1,000; Johnnie L. Schwarzauer $1,000; Edward J. Kramer $1,000; Nicholas Hernandez $1,000; Steve Malinowsky $1,000; Sandor Bago $1,000; Aires G. Marques $1,000; Andrew Bernard $1,000; Gustave W. Portrait $1,000; Orla O. Davenport $1,000; Max E. Moore $1,000; Paul E. Fish $1,000; George L. Zickl, Jr. $1,000.

boat and either remained in the lifeboat or went aboard the Esso Greensboro and extinguished the fire, ascertained that there were no survivors, but discovered the dead bodies, etc. Such additional award to such 14 men is shown in the margin.[25] Six of the 14 men served on board the Esso Greensboro after the fire had been extinguished and are still awarded an additional $500 each.[26] Two men who were not of the group of 14 men served on board the Esso Greensboro after the fire was extinguished and are awarded $500 in addition to such basic award.[27]

▆ (c) I conclude that there should be an award to each claimant herein who was an officer of the S.S. Virginia, and, that in making such award, the responsibility of such officer for the safety of his fellow officers, the members of his crew, and his vessel should be considered. Also there should be considered the danger in which such officer was placed and any dangerous or difficult service or tasks performed by him. Such award is made as shown in the margin.[28]

▆ 6: On the question of the right of those claimants herein who are officers and crew of the Esso New York and who are officers and crew of the Esso Burlington:

As shown by the Findings of Fact, such officers and crew had no part in extinguishing the fire on the Esso Greensboro and towing it into port, i. e., in the salvaging of the property which was saved. They claim, however, the right to salvage by reason of having saved the lives of 5 members of the crew of the Esso Greensboro and recovering 3 bodies. In the absence of a statute, they would not under the facts be entitled to salvage. Under the Statute, Sections 728 and 729, Title 46 U.S.C.A., they are entitled to salvage.[29]

The officers and crew of the Esso New York who are claimants herein are allowed salvage in the sum of $2,000, to be divided equally among them.[30]

The officers and crew of the Esso Burlington who are claimants herein are allowed salvage in the sum of $2,000, to be divided equally among them.[31]

Let decree be prepared and presented in accordance herewith.

25. The names of the 14 men and their *additional* awards are as follows:

Herman F. Rossmaier $5,000; Kermit G. Hebner $5,000; Cleve Edwards, Jr. $5,000; Max E. Moore $5,000; Steve Malinowsky $5,000; Andrew Bernard $5,000; Orla Owen Davenport $5,000; Johnnie Leonard Schwarzauer $5,000; Gustave Walter Portrait $5,000; William Francis Hutchins $5,000; Henry N. Wells $5,000; Otis W. Latson $5,000; Benedicto S. Munar $5,000; Coy v. Helton $5,000.

26. The names of the six men and the amount of this additional award are as follows:

Herman F. Rossmaier $500; Cleve Edwards, Jr. $500; Henry N. Wells $500; Coy H. Helton $500; Johnnie Leonard Schwarzauer $500; William Francis Hutchins $500.

27. These two men and the amount of their additional award are as follows:

Edward J. Kramer $500; Jay (Dee) Williams $500.

28. Such awards to the officers of the S. S. Virginia are made as follows: Leonard N. Dockrill, Master, $25,000; Martin O. Bowin, Jr., Chief Mate, $25,000; Lewe F. Faust, Second Mate, $15,000; Clyde E. Roberts, Third Mate, $10,000; James L. Simmons, Chief Engineer, $10,000; Paul R. Chase, First Assistant Engineer, $10,000; Joe W. Pruitt, Third Assistant Engineer, $5,000; J. M. Schieffer, Third Junior Assistant Engineer, $5,000; Kenneth O. Bellamy, Second Assistant Engineer, $5,000.

29. The Shreveport, 4 Cir., 42 F.2d 524; 56 C.J., pg. 21, Note 52; 56 C.J., pg. 22, Notes 68–82; Salvage, § 24; The Admiral Evans, 9 Cir., 286 F. 442; The Annie Lord, 1 Cir., 251 F. 157; In re St.Joseph-Chicago S.S. Co., 7 Cir., 262 F. 535.

30. See Note 3 for the names of the officers and crew of the Esso New York.

31. See Note 4 for the names of the officers and crew of the Esso Burlington.